# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARK WILLIAM TOWNSEND, | |
| Plaintiff, | |
| v. | Civil Action No. 15-1644(BAH) |
| UNITED STATES OF AMERICA, *et al.*, | Chief Judge Beryl A. Howell |
| Defendants. | |

## MEMORANDUM OPINION

The plaintiff, Mark William Townsend, brings this action against his former employer, the United States Environmental Protection Agency ("EPA"), as well as the United States Department of Justice ("DOJ") and the United States of America (collectively, the "agency defendants"), and ten current and former employees of the EPA and DOJ (collectively, the "individual defendants").[1]  First Amend. Compl. ("FAC") ¶¶ 16-30, ECF No. 35.[2]  The plaintiff alleges, in a 101 page complaint, violations of federal law separated into twenty-one different counts, under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.; Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq*.;

---

[1]      The individual defendants include the following ten persons with their titles as provided in the complaint: (1) Regina McCarthy, Administrator of the EPA; (2) Robert Perciasepe, Deputy Administrator of the EPA; (3) James Jones, Assistant Administrator for the Office of Chemical Safety and Pollution Prevention, EPA; (4) Louise Wise, Deputy Assistant Administrator for the Office of Chemical Safety and Pollution Prevention, EPA; (5) Martha Monell, Deputy Director of Management, Office of Pesticides Program, EPA; (6) Mark Kaminsky, Special Agent for the EPA, Office of the Inspector General; (7) Arthur Elkins, EPA Inspector General; (8) Ronald Machen, United States Attorney for the District of Columbia; (9) Vincent Cohen, Jr., former Principal Assistant United States Attorney for the District of Columbia and as Acting United States Attorney for the District of Columbia; (10) James Smith, Assistant United States Attorney; and Unknown Named Officials in both DOJ and the EPA.  FAC ¶¶ 18-21, 23-30.

[2]      The paragraphs in the FAC are misnumbered beginning on page 76, where paragraph "191" is mistakenly followed with paragraph "124" and erroneous consecutive numbering through the remainder of the FAC. Accordingly, citations to the FAC from page 76 through 101 will refer to the appropriate page number as well as the paragraph number on that page.

the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; the Privacy Act, 5 U.S.C.

§ 552a; 42 U.SC. §§ 1983, 1985; and for a number of Constitutional violations sounding in tort*,*

*see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

FAC ¶¶ 125-91; *id.* at 76-92, ¶¶ 124-74.[3]  These claims arise out of investigations into the

plaintiff's alleged role in time-and-attendance fraud at the EPA, his demotion and the removal of

his management responsibilities, and, ultimately, the termination of his employment.  *See*

*generally* FAC.  Pending before the Court are the agency defendants' and the individual

defendants' separate motions to dismiss the complaint for failure to state a claim upon which

relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).[4]  For the reasons set

---

[3]      At over 100 pages, the FAC is "quite long—a point that is more than simply a matter of aesthetics." *Ciralsky v. CIA*, 355 F.3d 661, 669 (D.C. Cir. 2004) (considering a complaint of 119 pages).  Rule 8 of the Federal Rules of Civil Procedure provides that a pleading "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  The plaintiff's statements of his claims are neither "short" nor "plain."  Instead, the complaint is a "repetitive, discursive and argumentative account of the alleged wrongs suffered by the plaintiff," *Ciralsky v. CIA*, 355 F.3d at 669, including superfluous and pejorative references to individuals who are not named as defendants and, other than the plaintiff's naked finger pointing, have no readily apparent relationship to any of the alleged wrongdoing.  *See, e.g.*, FAC ¶¶ 6, 24, 33, 37, 62, 86 (referring to "White House advisor John Podesta"); *id.* ¶ 5 (referring to an employee as "a caretaker manager"); *id.* ¶ 44 (describing an employee as "the young serial violator"); *id.* ¶ 45 (referring to another employee as "an unstable, low-performing malcontent").  This unnecessary name-calling and "prolixity . . . places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Ciralsky*, 355 F.3d at 669 (internal quotation marks and citation omitted; alteration adopted).  Indeed, excessively long complaints often contain "[s]urplusage [that] can and should be ignored[,]" *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003), and excessive discussions of irrelevant facts "make a complaint unintelligible, by scattering and concealing in a morass of irrelevancies the few allegations that matter[,]" *id.*  "Taken together, Rules 8(a) and 8(d)(1) [of the Federal Rules of Civil Procedure] underscore the emphasis placed on clarity and brevity by the federal pleading rules," *Ciralsky v. CIA*, 355 F.3d at 669 (quoting *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 702 (3d Cir.1996) (quoting 5 Charles Alan Wright & Arthur Miller, FEDERAL PRACTICE AND PROCEDURE § 1217, at 169 (2d ed.1990))), and "Rule 41(b) authorizes the court to dismiss either a claim or an action because of the plaintiff's failure to comply with the Federal Rules," *id.* at 669.  The FAC comes close to breaching Rule 8's command that "[e]ach allegation must be simple, concise, and direct."  FED. R. CIV. P. 8(d)(1).

[4]      The agency defendants also move, under Federal Rule of Civil Procedure 12(b)(1), to dismiss Counts XIX and XX, which assert claims for violations of 42 U.S.C. § 1985, for lack of subject-matter jurisdiction since the United States and federal agencies enjoy sovereign immunity from these civil rights claims.  FED. R. CIV. P. 12(b)(1).  The agency defendants are correct.  It is well established that the United States has not waived its sovereign immunity in suits for money damages due to alleged constitutional violations, including for claims brought pursuant to Section 1985.  *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Hohri v. United States*, 782 F.2d 227, 245 n.43 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987) (holding that Section 1985 "by [its] terms, do[es] not apply to actions against the United States"); *Jachetta v. United States*, 653 F.3d 898, 908 (9th Cir. 2011)

forth below, the individual defendants' motion is granted and the agency defendants' motion is granted in part and denied in part.

## I.      BACKGROUND

The plaintiff, a Caucasian 68-year-old male, FAC ¶¶ 5, 15, was formerly employed by the EPA as a self-described "middle-manager," *id.* ¶ 1, "branch chief," *id.* ¶ 55, and "Senior Science Advisor," *id.* ¶ 15.   The plaintiff's twenty-one claims rely on his allegations regarding five separate investigations by the EPA and DOJ into the plaintiff's role in time-and-attendance fraud at the EPA.   *See id.* ¶¶ 7, 8, 82.[5]   The plaintiff does not dispute that all of the investigations were, at least facially, triggered by legitimate concerns about time-and-attendance misconduct within the agency.   Indeed, as he admits, the plaintiff oversaw "myriad malfeasance concerning time and attendance fraud," *id.* ¶ 6, by staff "that did no work" in multiple EPA branches, *id.* ¶ 57.   Both downplaying and excusing his role in this misconduct, however, the plaintiff contends that the general EPA practice was to avoid assigning work to "low performing employees, but to sign time cards indicating such employees were available to work." *Id.*   Following the various investigations conducted by the EPA and by the U.S. Attorney's Office for the District of Columbia ("DC-USAO"), the plaintiff was eventually demoted from his role as branch chief,

---

(finding "no evidence in either statute that Congress intended to subject federal agencies to § 1983 and § 1985 liability"); *Scurlock v. Lappin*, 870 F. Supp. 2d 116, 120 (D.D.C. 2012) (dismissing section 1985 claim "for lack of subject matter jurisdiction"); *Mullen v. Bureau of Prisons*, 843 F. Supp. 2d 112 (D.D.C. 2012) (dismissing section 1985 claim against United States as barred by sovereign immunity); *White v. United States*, 791 F. Supp. 2d 156, 161 (D.D.C. 2011) (same).   Accordingly, Counts XIX and XX are dismissed.

[5]      Although the plaintiff repeatedly states that he was subject to "at least five" investigations, *e.g.*, FAC ¶¶ 7, 8, 82, his identification of the timing of and participants in each investigation is imprecise.   Reading his complaint generously, details appear to be provided as to only four investigations: (1) an internal investigation triggered by a "hotline" tip from another EPA employee to the EPA's Office of the Inspector General ("OIG") and prompted an interview of the plaintiff on July 3, 2012, *see id.* ¶¶ 40, 42, 45; (2) a criminal investigation by the U.S. Attorney's Office for the District of Columbia after OIG referred the case, *see id.* ¶¶ 58-59, 69, 71; (3) an internal investigation started in the Fall 2013 and conducted by James Jones, the Assistant Administrator for EPA's Office of Chemical Safety and Pollution Prevention, *see id.* ¶¶ 82-83, 85; and (4) an internal investigation allegedly ordered by EPA Administrator McCarthy, and conducted by lawyers in the EPA's Office of General Counsel and EPA Labor and Employee Relations, *see id.* ¶¶ 81, 84.

"stripped of all management responsibility," *id.* ¶ 94, and was eventually terminated on October 7, 2014, *id.* ¶ 99.  Two other EPA managers were similarly removed from their management jobs due to involvement in this "significant misconduct," *id.* ¶ 50, although, in the plaintiff's view, they were not subject to the same level of punitive measures as the plaintiff, *see, e.g.*, *id.* ¶ 37 ("Despite Craig's criminal activities . . . . [she] was, upon information and belief *promoted* and allowed to retire with a higher pension") (emphasis in original); *id.* ¶ 50 ("the comparator Hernandez was removed from his job . . . with knowledge that he engaged in significant misconduct for 20 years, yet Hernandez was neither admonished nor was his record in the least reflective of his disastrous performance and decades-long criminal misconduct."); *id.* ¶ 135 ("Beth Craig[] was allegedly rewarded for her political expedience and allowed to retire after allegedly committing massive time and attendance fraud during and within the context of the employment of John Beale.").

    Against this backdrop of his perceived unfair treatment for his alleged role in the "widespread EPA time and attendance misfeasance and related corruption," *id.* ¶ 4, the plaintiff asserts separate claims against the federal agencies responsible for conducting the investigations and taking adverse personnel actions affecting him, and against the individual defendants, who participated in the investigations and personnel actions, *see id.* ¶ 31 (explaining that the claims against the agency and individual defendants "tend[] not to overlap").  First, in his twelve remaining claims against the agency defendants, the plaintiff alleges that despite his admitted role in time-and-attendance fraud at the EPA, his demotion and termination from the EPA were part of an "attempt by EPA upper management . . . to remove older employees in favor of a younger, more diverse body of line management."  *Id.*  Hence, he concludes that his demotion and termination were "based upon age, race and gender" discrimination, *id.* ¶ 94, in violation of

Title VII and the ADEA, as well as the APA and the Privacy Act.  Second, in his seven claims against the individual defendants, the plaintiff asserts that his constitutional and civil rights were violated in the course of the investigations into his role in time-and-attendance fraud.  The factual allegations underlying these two sets of claims are briefly summarized below.

### A.  The Investigations of the Plaintiff

After the EPA's Office of the Inspector General ("OIG") received a "hotline" tip from another EPA employee, the OIG initiated an investigation of the plaintiff.  *Id.* ¶ 45.  On July 3, 2012, OIG officials, including defendant Mark Kaminsky, a Special Agent for OIG, interviewed the plaintiff regarding his involvement in time-and-attendance fraud by the plaintiff's subordinate, who suffered from multiple sclerosis.  *Id.* ¶¶ 40, 42.[6]  According to the plaintiff, his former supervisor, Oscar Hernandez, had directed the plaintiff to permit this subordinate to work from home due to her medical condition, as she had been doing for approximately two decades. *Id.* ¶ 42.  The plaintiff states that a "system" had been created to accommodate the subordinate's chronic illness: she would orally report her "time and attendance" to the office timekeeper, who would then, under instructions from Hernandez, input and approve the employee's time records. *Id.* ¶ 43.  The plaintiff blames Hernandez, who is described as "Hispanic," *id.* ¶ 55, for "creat[ing], sustain[ing], and is fully responsible . . . for all mistakes made in the timekeeping and leave policy for" the subordinate, *id.* ¶ 56.  Yet, Hernandez was not disciplined for the two-

---

[6]      Before the OIG interview began, the plaintiff states that he was coerced by Kaminsky into signing an "Acknowledgment" form, waiving certain rights, while he was "under duress, threats and misleading interrogation techniques."  FAC ¶ 40.  Additionally, the plaintiff alleges that Kaminsky "knowingly misled" the plaintiff as to the topic of the "interrogation" and "threatened and intimidated Plaintiff constantly."  *Id.*

decade long "system" which he designed, *id.* ¶ 50, but instead was "reassign[ed]" to another office and allowed to retire before the investigation into the plaintiff began, *id.* ¶ 46.

While blaming Hernandez for the system of regularly approving fraudulent timesheets for the plaintiff's subordinate, the plaintiff admits that, as a supervisor, he complied with instructions to sign off on the fraudulent time cards for this subordinate and apparently other "low performing employees," since, in his view, "the exact EPA customary practices were made obligatory upon him in his new position," *id.* ¶ 57.  He also followed this same practice in his "previous two branch chief assignments," again placing the blame on another former supervisor. *Id.*  According to the plaintiff, "both branches contained staff that did no work" and an EPA division director informed him that the EPA "condoned" the approval of fraudulent time cards "so as not to risk the ire of the union stewards."  *Id.*  In other words, the plaintiff makes clear that during his supervisory career at the EPA, he had participated as a "customary practice" in fraudulent time-and-attendance practices that were not limited to his approval of one subordinate's time cards.

After the interview, Kaminsky referred the plaintiff's case to the DC-USAO, *id.* ¶ 58, which initiated a criminal investigation, *id.* ¶ 59.  The plaintiff attributes this second investigation as based "wholly upon the misleading representations of Kaminsky."  *Id.*  On April 23, 2013, DOJ conducted a "debriefing" session with the plaintiff and subsequently shared with the EPA Office of General Counsel ("OGC") "private, privileged information" relayed by the plaintiff during this session.  *Id.* ¶ 69.  Kaminsky and defendant Jim Smith, an Assistant United States Attorney with the DC-USAO, then allegedly "pressure[d] Plaintiff to plead guilty to . . . [a] set of local and federal claims . . . [but] Plaintiff refused to admit to criminal activity . . . ." *Id.* ¶ 71.  The plaintiff also alleges that, over the course of several months, Smith "threatened

Plaintiff (through counsel) with imminent indictment – forcing Plaintiff to the very edge of sanity, deep into a depressive state, and suicidal." *Id.* ¶ 73.

In October 2013, a third investigation began when defendant James Jones, the Assistant Administrator for EPA's Office of Chemical Safety and Pollution Prevention, allegedly "arranged for his long-term employee . . . [defendant] Marty Monell, to directly assist [Jones] in conducting an(other) unconstitutional investigation of Plaintiff." *Id.* ¶ 82. According to the plaintiff, "Monell both unduly pressured the Plaintiff's 'office timekeeper' and promised the timekeeper she would keep her job if the timekeeper . . . would provide enough information to implicate and/or remove Plaintiff." *Id.* ¶ 83. The plaintiff alleges that Monell issued a Report of Investigation in November 2013, which report apparently concluded that the plaintiff was "'guilt[y]' in a 'time card fraud' scheme," *id.* ¶ 5, although the plaintiff describes the report as "defamatory" and containing "false statements," *id.*; *id.* at 85 ¶ 152 (noting that "Monell investigation" resulted in "a recommendation of adverse action against Plaintiff"). The plaintiff blames this particular investigation on defendant Louise Wise, who served as the Deputy Administrator for EPA's Office of Chemical Safety and Pollution Prevention, and was the "Proposing Official" in a subsequent removal action against the plaintiff as a result of the internal investigations into the plaintiff's role in the time-and-attendance fraud. *Id.* ¶ 85.

In February 2014, the plaintiff explains that he was "asked by a Member of Congress or their staff to describe his experience to the *Wall Street Journal*," and the plaintiff "permitted his story to be profiled," even though he was unaware at the time of the posture of the criminal investigation. *Id.* ¶ 76. Subsequently, the *Wall Street Journal* published an "editorial" arguing that the EPA should focus its investigative efforts not on the plaintiff, but instead on EPA officials involved in the matter of John Beale, *id.*, who, for over a decade as an EPA employee,

"misle[d] his supervisors into believing he was on assignment for the Intelligence Community ('IC') when he was apparently actually home (and on various travel) doing little to no work for the United States Government and/or EPA," *id.* ¶ 61; *see also id.* ¶¶ 62, 81. "Within days of the *Wall Street Journal* editorial," the plaintiff was informed that another Assistant United States Attorney, who is not named as a defendant in this matter, had already told Kaminsky in late 2013 that DOJ would not pursue a prosecution of the plaintiff. *Id.* ¶ 77; *see also id.* ¶ 74.

According to the plaintiff, revelations about John Beale's long-term fraudulent activity contributed to a fourth investigation after Administrator McCarthy was, in the plaintiff's words, "excoriated in the media and before Congress for her role in the John Beale debacle," and looked "for a sacrificial scapegoat to deflect attention from her own wrongdoing." *Id.* ¶ 81; *see also id.* ¶ 62 ("EPA upper management sought political cover . . . by scapegoating Plaintiff with . . . pretextual misfeasance, while seeking to place younger, longer-term employees into the void and assuring continued acquiescence and loyalty."). Without providing any clarity on the timing, the plaintiff alleges that McCarthy ordered EPA attorneys in OGC and in EPA Labor and Employee Relations ("LER") "to initiate an illegal investigation in support of removal proceedings regarding Plaintiff." *Id.* ¶ 81. According to the plaintiff, this fourth investigation not only "blam[ed] Plaintiff," it also "served [EPA's] ulterior purpose . . . of pretext for the ongoing initiative to target older employees within the Division from which Plaintiff was ultimately removed, and more broadly within the Agency." *Id.* ¶ 81; *see also id.* ¶ 88 (explaining that "Administrator McCarthy and [Deputy Administrator] Perciasepe gave the order to terminate Plaintiff []or constructively remove him by making his working conditions intolerable, thereby forcing him to involuntarily retire or kill himself"). In this investigation, the plaintiff alleges that "EPA personnel from OGC and LER . . . pressured Plaintiff's fellow branch

8

chiefs . . . in an attempt to obtain inaccurate sworn statements from the branch chiefs that would

assist with a planned removal action against Plaintiff." *Id.* ¶ 85.

### B.  The Plaintiff's Demotion and Removal

Although the FAC is vague about dates, at some point in 2013, the Risk Assessment

Division of EPA, where the plaintiff worked, was reorganized.  *Id.* ¶ 127 (referring to the "office

reorganization begun in 2013").  By this time, the plaintiff's misconduct had already been

subject to internal investigations by EPA and review by the DC-USAO, but "[t]he EPA

continued to delay addressing Plaintiff's status, leading Plaintiff to believe he was being fully

integrated into his reorganized Division . . . ."  *Id.* ¶ 89.  Apparently, his belief about "being fully

integrated" was abruptly dashed on September 5, 2013, when the plaintiff alleges that he was

"asked" by Tala Henry, whom he describes as a "putative supervisor," *id.* ¶ 127, to "accept the

constructive demotion as part of a staffing plan that defendants Cleland-Hamnett and Henry

(with the approval of defendant Jones) had devised for the Risk Assessment Division."  *Id.* ¶

128.[7]  The plaintiff describes the manner in which he was "asked" variously as "strong-armed,"

*id.*, and "openly pressured and threatened," *id.* ¶ 93.  He further details Henry's words, alleging

that Henry asked him "**to 'step aside' as branch chief in order to make room for 'younger'**

**employees** who had been selected and sponsored by the EPA to attend management training."

*Id.* ¶ 93 (emphasis in original); *id.* ¶¶ 128, 143 (repeating alleged statement by Henry).  The

plaintiff "refused to step aside despite the threats and pressure." *Id.* ¶ 94.

The following day, on September 6, 2013, Henry informed the plaintiff that he would be

reassigned "from Branch Chief to a Senior Advisor position in order to make management

---

[7]      The plaintiff refers to both Henry and Cleland-Hamnett as "defendants" throughout his complaint, *see e.g.*, FAC ¶¶ 49, 90, but neither of these individuals is named as a defendant in the caption of the FAC or otherwise described in the portion of the FAC listing the defendants, *id.* ¶¶ 16-30.

positions available to younger staff who had just completed training at American University."
*Id.* ¶ 143.  The plaintiff alleges that this reassignment amounts to a constructive demotion since
he was "stripped of all management responsibility," *id.* ¶ 94, "to provide headroom for two
younger and less-qualified African-American females," including one who is "now encumbering
the position from which Plaintiff was removed."  *Id.* ¶ 4; *see also id.* ¶¶ 36, 130-31; 145-46.

The plaintiff alleges that the reorganization was part of an "ongoing initiative to target
older employees," *id.* ¶ 81, which was planned and executed by a supervisor, Wendy Cleland-
Hamnett and Tala Henry, with the approval of defendant James Jones, *id.* ¶ 171, so that the
division would "reflect a younger, more 'diverse' management group," *id.* ¶ 90.  As part of the
plan, Cleland-Hamnett allegedly "instructed" Tala Henry to "'sweep' older managers from their
positions under the pretext of a so-called 'staffing plan.'"  *Id.* ¶ 91; *id.* ¶ 36 (referring to "the plan
to displace older subordinates, including but not limited to Plaintiff"); *id.* ¶ 171 ("Henry
pressured Plaintiff to accept a non-managerial position in order to promote younger, more
diverse (and far less qualified) employees, which has had a devastating disparate impact upon
Plaintiffs [sic] and numerous others similarly impacted.").

Over six months after Henry told the plaintiff of his reassignment to a new position as
Senior Advisor, on April 14, 2014, he was moved to a "new, shared office space and humiliated
by sharing with a junior staff member who had previously . . . been a subordinate of Plaintiff."
*Id.* ¶ 95.  This office move was part of what the plaintiff describes as a "continuing hostile work
environment and disparate treatment," prompting him to file complaints with the EPA Office of
Civil Rights ("OCR").  *Id.* ¶ 89.  The plaintiff also alleges that Henry "routinely walked by the

new office and laughed at Plaintiff – asking him how 'things looked on the way out' and how 'did he like his new little man cave.'" *Id.* ¶ 95.

The plaintiff was eventually notified "that he was to be removed from the EPA and from federal service," and, on July 31, 2014, he was "escorted from the building." *Id.* ¶ 96.  Although the plaintiff states he "responded aggressively" to the removal notice and "fil[ed] numerous statements," "Administrator McCarthy ordered Jim Jones to formally remove Plaintiff effective October 7, 2014." *Id.* ¶¶ 98-99.

### C.  The Plaintiff's Appeal Before The Merit Systems Protection Board

On October 17, 2014, the plaintiff appealed his removal to the Merit Systems Protection Board ("MSPB").  *Id.* ¶ 100.  After the MSPB accepted the "mixed case appeal," *id.* ¶ 101, the plaintiff was afforded considerable discovery, and took depositions of "key" agency officials— including Jones, Kaminsky, and Wise, *id.* ¶¶ 86, 97-98—which allegedly show "criminal wrongdoing on the part of Jim Jones (the Deciding Official) and Kaminsky[,] . . . among several others," *id.*  ¶ 101.[8]  The plaintiff explains that he received a "confusing and incongruous MSPB 'Order'" on September 17, 2015, "noticing a hearing in Plaintiff's matter for December 3, 2015." *Id.* ¶ 115.  Nonetheless, as of the filing of the plaintiff's complaint, his MSPB appeal remains unresolved.

---

[8]      A "mixed case" is defined by statute as one in which the employee "(A) has been affected by an action which [she] may appeal to the Merits Systems Protection Board, and (B) alleges that a basis for the action was discrimination prohibited by" certain federal laws.  5 U.S.C. § 7702(a)(1).  Decisions of the MSPB are generally "reviewed in the Federal Circuit."  *Perry v. Merit Systems Protection Board*, 2016 WL 3947838, at *1 (D.C. Cir. July 22, 2016).  In some circumstances, when a plaintiff has a "mixed case" involving claims of both adverse employment action and discrimination, suit may eventually be brought in federal district court.  *See infra* note 9.

## II.      STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Wood v. Moss*, 134 S. Ct. 2056, 2067 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability," but "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action" are needed for "'grounds'" of "'entitle[ment] to relief,'" *Twombly*, 550 U.S. at 555 (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 46-47 (1957)), and "nudge[ ] [the] claims across the line from conceivable to plausible," *id.* at 570.  Thus, "a complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss for failure to plead a claim on which relief can be granted, the court must consider the complaint in its entirety, accepting all factual allegations in the complaint as true, even if doubtful in fact, and construe all reasonable inferences in favor of the plaintiff.  *Twombly*, 550 U.S. at 555; *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) ("We assume the truth of all well-pleaded factual allegations and construe reasonable inferences from those allegations in a plaintiff's favor."  (citing *Sissel v. U.S. Dep't of Health & Human Servs.*, 760 F.3d 1, 4 (D.C. Cir. 2014))).  The Court "need not, however, 'accept

inferences drawn by [a] plaintiff[] if such inferences are unsupported by the facts set out in the complaint.'" *Nurriddin*, 818 F.3d at 756 (alteration in original) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

### B. Motions to Dismiss Employment Discrimination Claims Generally

The Supreme Court has instructed that "the precise requirements of a *prima facie* case can vary depending on the context" and "should not be transposed into a rigid pleading standard for discrimination cases." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  In view of this "emphasis on flexibility," the D.C. Circuit has adopted, for claims asserted under various anti-discrimination statutes, a "general version of the *prima facie* case requirement: 'the plaintiff must establish that (1) she [or he] is a member of a protected class; (2) she [or he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)); *see also Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007); *George v. Leavitt,* 407 F.3d 405, 412 (D.C. Cir. 2005); *Krodel v. Young*, 748 F.2d 701, 705 (D.C. Cir. 1984) ("an individual plaintiff claiming disparate treatment must first make out a *prima facie* case -- *i.e.*, must demonstrate sufficient facts to create a reasonable inference that race, sex or age was a factor in the employment decision at issue.").  The burden of showing a *prima facie* case at the pleading stage "is not onerous." *Id. Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The pleading of direct evidence of intentional discrimination will "generally entitle a plaintiff to a jury trial," *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011), and gives clear rise "to an inference of discrimination" sufficient to establish a *prima facie* case, *see Swierkiewicz*, 534 U.S. at 510-11 ("[I]f a plaintiff is able to produce direct evidence of

discrimination, he may prevail without proving all the elements of a prima facie case."). One form of direct evidence is "a statement that itself shows racial or gender bias in the [employment] decision." *Vatel*, 627 F.3d at 1247; *see also Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576-77 (D.C. Cir. 2013) (holding that the statement referring to the plaintiff as a "young black man" was direct evidence that entitled the plaintiff to a jury trial); *Stone v. Landis Constr. Corp.*, 442 F. App'x 568, 569 (D.C. Cir. 2011) (reversing a district court's grant of summary judgment for the defendant where the defendant allegedly told the plaintiff "you're old" which "qualified as direct evidence of [the defendant's] discriminatory intent.").

Absent direct evidence of discrimination, a plaintiff may prove discrimination through circumstantial evidence using the familiar three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green* ("*McDonnell Douglas*"), 411 U.S. 792, 793 (1973), which generally applies at summary judgment, *see, e.g.*, *id.* (applying framework to Title VII claim); *Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010) (applying framework to an ADEA claim); *Krodel v. Young,* 748 F.2d at 705 (same). Under *McDonnell Douglas*, the plaintiff has the initial burden of production to establish a prima facie case of discrimination; if he does, then the employer must articulate a legitimate, non-discriminatory reason for its action; and if it does, then the plaintiff must receive an opportunity to show that the employer's reason was a pretextual cover for discrimination. *McDonnell Douglas,* 411 U.S. at 802-05; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000).

At the motion to dismiss stage, however, an employment discrimination plaintiff need not anticipate legitimate, non-discriminatory reasons that may be proffered by the employer for the adverse employment action nor allege pretext to survive a motion to dismiss. *See Swierkiewicz*, 534 U.S. at 511, 515 (holding that "under a notice pleading system, it is not appropriate to

require a plaintiff to plead facts establishing a *prima facie* case because the *McDonnell Douglas* framework does not apply in every employment discrimination case" and "the Federal Rules do not contain a heightened pleading standard for employment discrimination suits"); *see also Twombly*, 550 U.S. at 569-70, 586 ("it should go without saying in the wake of *Swierkiewicz* that a heightened production burden at the summary judgment stage does not translate into a heightened pleading burden at the complaint stage"); *Jones v. Air Line Pilots Ass'n, Intern*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) (noting that in discrimination suit, a "plaintiff is not required to plead every fact necessary to establish a *prima facie* case to survive a motion to dismiss" (citing *Swierkiewicz*)); *Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161-162 (D.C. Cir. 2015) (noting that a plaintiff "need not plead facts showing each of the[] elements [for a discrimination claim] in order to defeat a motion under Rule 12(b)(6)," relying on *Swierkiewicz*, where "the [Supreme] Court rejected such a pleading requirement for discrimination claims," and, in *Twombly,* "actually reaffirmed" *Swierkiewicz*); *Brown v. Sessoms*, 774 F.3d 1016, 1022-1023 (D.C. Cir. 2014) ("We have been clear, however, that '[a]t the motion to dismiss stage, the district court cannot throw out a complaint even if the plaintiff did not plead the elements of a *prima facie* case.'" (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008))).

At the same time, however, when an employment discrimination complaint contains fulsome factual context for the challenged adverse employment action, those allegations must be considered collectively in evaluating the reasonableness and plausibility of the inferences urged by the plaintiff.  In such circumstances, the plaintiff may plead himself out of court "by alleging facts that render success on the merits impossible."  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir. 2000); *see also Nurriddin*, 818 F.3d at 757 (affirming dismissal of Rehabilitation Act claim upon finding that plaintiff essentially "plead[ed] himself out of court"

by "directly conced[ing] that despite [his medical] condition," he was able to perform some

positions within agency and by providing facts showing the agency "perceived him as being

capable of working," which factual allegations did not support an inference of "a disability

within the meaning of the statute, or [the agency] regarding him as so impaired"). Thus, at the

motion-to-dismiss stage, the guiding lodestar is whether, assuming the truth of the factual

allegations, taken collectively, whether the inferences of discrimination drawn by the plaintiff are

reasonable and plausibly supported. *Id*. at 756 (noting that court "need not, however 'accept

inferences drawn by [a] plaintiff[] if such inferences are unsupported by the facts set out in the

complaint.'" (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

## III.    DISCUSSION

As noted, the plaintiff was demoted and terminated from the EPA after the EPA and DOJ

conducted, by the plaintiff's count, five separate investigations into his role in time-and-

attendance fraud at the EPA. FAC ¶¶ 7, 8, 82. Throughout his complaint, the plaintiff makes

clear that time-and-attendance fraud was rampant at the EPA. Indeed, the plaintiff, aware of his

"own exposure," made a number of self-described "whistleblower" disclosures to various

entities, including DOJ, "regarding the defective EPA time and attendance system" and the

"culture of corruption and myriad malfeasance concerning time and attendance fraud in the EPA

Office of Pollution Prevention and Toxics." *Id.* ¶¶ 6, 67. Nonetheless, the plaintiff maintains

that with respect to *him*, the five investigations were nothing more than "pretext" for an effort

"by EPA upper management . . . to remove older employees in favor of a younger, more diverse

body of line management." *Id.* ¶ 31. The plaintiff claims that his demotion and eventual

termination were, in fact, unrelated to his admitted role in time-and-attendance fraud and instead

are causally connected to discrimination based on age, sex and race, as well as in retaliation for

complaints he made to, among other entities, OCR.  Moreover, the plaintiff argues that in the course of conducting these five investigations, the individual defendants violated a number of his constitutional and civil rights.

The defendants' challenges to these claims are discussed below, with those against the agency defendants discussed first before turning to the claims against the individual defendants.[9]

## A.  CLAIMS AGAINST THE AGENCY DEFENDANTS

The plaintiff brings a variety of claims against the agency defendants separated into following twelve remaining counts: (1) claims, under the ADEA, for disparate treatment age discrimination (Counts I, II, V) and disparate impact age discrimination (Count VIII); (2) claims, under Title VII, for race and sex discrimination (Counts III, IV, VI, and VII); (3) a claim, under both the ADEA and Title VII, for hostile work environment (Count IX); (4) a claim, under Title VII, for retaliation (Count X); (5) a claim under the APA (Count XVII); and (6) a claim for a violation of the Privacy Act (Count XVIII).  These claims are assessed *seriatim* below.

---

[9]        The agency defendants posit that if the Court declines to dismiss any of the plaintiff's discrimination claims, this action should be stayed pending completion of the MSPB review.  The Court disagrees.  Under the Civil Service Reform Act of 1978 (the "CSRA"), 5 U.S.C. § 1101 et seq., employees have the right to appeal certain agency personnel actions "[i]f (but only if) the action is particularly serious."  *Kloeckner v. Solis*, 133 S.Ct. 596, 600 (2012) (citing 5 U.S.C. §§ 1204, 7512, 7701).  "When an employee complains of a personnel action serious enough to appeal to the MSPB *and* alleges that the action was based on discrimination, she is said (by pertinent regulation) to have brought a 'mixed case.'"  *Id.* at 601 (citing 29 CFR § 1614.302 (emphasis in original)).  The statute governing mixed cases before the MSPB, 5 U.S.C. § 7702, makes clear that "if the MSPB fails to render a judicially reviewable decision within 120 days from the filing of a mixed case appeal, the aggrieved party can pursue her claim in federal district court."  *Butler v. West*, 164 F.3d 634, 639 (D.C. Cir. 1999) (citing 5 U.S.C. § 7702(e)(1)(B)).  The plaintiff brought an appeal before the MSPB on October 17, 2014, *id.* ¶ 100, and instituted this lawsuit nearly one year later, without resolution by the MSPB of the appeal.  Although a district court retains discretion to stay a case when an appeal to the MSPB is pending, *Butler v. West*, 164 F.3d at 643 (noting that a district court may stay a case "for a reasonable period of time" to "allow the court to benefit from the exercise of MSPB expertise, preserving judicial resources while simultaneously protecting the right of appeal contained in Section 7702(e)(1)(B)"), Section 7702 "clearly express[es] Congress' desire that mixed cases should be processed expeditiously, and that complainants should have access to a judicial forum should their claims languish undecided in the administrative machinery."  *Id.* at 640.  Given the length of time that has lapsed since the plaintiff filed his MSPB appeal, the agency defendants have not articulated a persuasive reason why a stay would be appropriate in this particular case.

### 1.  Age Discrimination: Counts I, II, V, and VIII

In Counts I, II, and V, against the defendant EPA, the plaintiff claims that his demotion and termination were due to age discrimination, which claims are bolstered by allegations regarding his disparate treatment and statements by EPA officials that he should "step aside" to make room for younger employees.  FAC ¶¶ 125-50, 160-63.  The sufficiency of each of these claims is analyzed following review of the applicable legal standard.

### a.  Legal Standard

The ADEA requires that "[a]ll personnel actions affecting [federal] employees . . . who are at least 40 years of age . . . shall be made free from any discrimination based on age."  29 U.S.C. § 633a(a).  The ADEA's "protections for employees of the federal government are, if anything, even more expansive than those for workers employed in the private sector."  *Miller v. Clinton*, 687 F.3d 1332, 1336-37 (D.C. Cir. 2012).  In drafting the federal-sector provision of the ADEA in Section 633a, "Congress deliberately prescribed a distinct statutory scheme applicable only to the federal sector . . . ."  *Lehman v. Nakshian,* 453 U.S. 156, 166 (1981) (summarizing the legislative history of the 1974 amendments).  Instead of simply applying Section 623, the existing provision for private sector employers, to the federal government, Congress passed Section 633a as a "broad, general ban on 'discrimination based on age'" that "was patterned 'directly after'" the federal-sector discrimination ban in Title VII of the Civil Rights Act.  *Gomez-Perez v. Potter,* 553 U.S. 474, 487-88 (2008) (quoting *Lehman,* 453 U.S. at 167 n.15); *see Forman v. Small*, 271 F.3d 285, 296 (D.C. Cir. 2001) ("Congress used sweeping language when it . . . extended the ADEA to cover federal agency employees.").  Thus, "while a section 623 plaintiff must . . . show that the challenged personnel action was taken because of age," a section 633a plaintiff need merely "show that the personnel action involved 'any discrimination based on age.'"  *Ford v. Mabus*, 629 F.3d at 205.  Accordingly, as a federal employee, a plaintiff

may establish liability by using direct or circumstantial evidence to show that age was a "factor" in the challenged employment action.

Application of these legal principles to Counts I, II, and V are addressed next.

### b. Count I

In Count I, the plaintiff challenges, as "*De Jure*" age discrimination, FAC Count I, at 61-63, two adverse employment actions that he claims amounted to disparate treatment on the basis of age, *id*. ¶ 126: (1) the plaintiff's "constructive demotion" that included "strip[ing] [him] of all management responsibility," FAC ¶¶ 94, 126-128; and (2) the plaintiff's removal from federal service on October 7, 2014, *see id.* ¶¶ 2, 6, 11, 25-26, 81, 85-86, 96-97, 99, 126.

### i. The Plaintiff's Constructive Demotion

As support for his claim that his constructive demotion was based on age discrimination, the plaintiff alleges that Tala Henry, his "putative supervisor," "who was slated . . . to assume the position vacated by" the plaintiff's former supervisor, "illegally pressured" the plaintiff by telling him to "'step aside' as branch chief in order to make room for 'younger' employees." *Id.* ¶¶ 127-128. The plaintiff characterizes this alleged statement, for the purposes of a motion to dismiss, as "game, set, match." *Id.* ¶ 128. Indeed, such a clear statement that the plaintiff must provide room for "younger employees" would ordinarily give rise to a plausible inference of "bias in the employment decision" and thus "qualif[y] as direct evidence of age discrimination." [10] *Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014) (internal quotation marks and citation

---

[10]    In order to make a *prima facie* case of age discrimination under the ADEA, the plaintiff must show that he suffered an "adverse employment action," which is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003). The plaintiff's demotion qualifies as an adverse employment action. *See Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007) (noting that "withdrawing an employee's supervisory duties . . . constitutes an adverse employment action" (quoting *Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003)); *see also Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002) ("[W]e

omitted).  In *Wilson,* the plaintiff alleged that the employer's Chief Operating Officer told the plaintiff that certain employees were "'here to retire' rather than to work, and that he had concerns about the older security guards falling asleep on the job."  753 F.3d at 247.  Holding that these two statements constituted "direct evidence of age discrimination," the D.C. Circuit concluded that a "reasonable factfinder could conclude from those statements that a discriminatory intent motivated the" employment decision at issue as they "indicate[d] the sort of 'inaccurate and stigmatizing stereotypes' that led Congress to enact the ADEA," entitling the plaintiff "to proceed to trial."  *Id.* at 247-48 (quoting *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610 (1993)).

Consequently, motions to dismiss are regularly denied in this Circuit where the plaintiff alleges that the employer made a blatant discriminatory statement together with a plausible connection between that statement and an adverse employment decision.  *See, e.g.*, *Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 89 (D.D.C. 2012) (denying motion to dismiss ADEA claim where plaintiff alleged that she had been called "one of the 'GOLDEN GIRLS'"); *Miller v. Gray*, 52 F. Supp. 3d 62, 67-68 (D.D.C. 2014) (concluding that, at the motion to dismiss stage, employer's alleged statement about "seeking a greater balance of older and younger teachers" was sufficient to state a claim for age discrimination).

Yet, the plaintiff "must nevertheless plead sufficient facts to show a plausible entitlement to relief."  *Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011); *see Iqbal,* 556 U.S. at 677. The extensive allegations presented in the complaint lays out not only the plaintiff's claims of discrimination but also detailed legitimate, non-discriminatory reasons for the employment

---

have no doubt that the removal of [plaintiff's] supervisory responsibilities constituted an adverse employment action.").

decisions made regarding the plaintiff.  In this way, the instant complaint makes apparent, at the initial pleading stage, the employer's proffered reason for the adverse employment action, even though the defendants would otherwise be barred from including "matters outside the pleadings." FED. R. CIV. P. 12(d) (stating that if a defendant includes materials outside the pleadings, motion to dismiss must be construed as one for summary judgment).  Thus, while employment discrimination plaintiffs can ordinarily survive a motion to dismiss without any discussion of whether the employer may have had a legitimate, non-discriminatory reason for the employment decision at issue, the plaintiff in this case provided multiple details about the EPA's proffered rationale for the decision to terminate the plaintiff: namely, that the plaintiff sanctioned and participated in time-and-attendance fraud by subordinates in the agency.  *See* FAC ¶¶ 42-44 (discussing the investigation into the plaintiff's involvement in time-and-attendance misconduct); *id.* ¶¶ 81-87 (explaining that the "pretextual" reason for the plaintiff's termination was his role in his subordinate's fraudulent time-and-attendance reporting).

Unsurprisingly, in their motion to dismiss, the agency defendants rely heavily on the plaintiff's admissions that he approved fraudulent time-and-attendance records, misconduct for which the plaintiff acknowledges that the EPA and its head were "deservedly excoriated in the media and before Congress . . . ."  FAC ¶ 81; *see, e.g.*, Agency Defs.' Mem. Supp. Mot. Dismiss ("Agency Defs.' MTD") at 12, ECF No. 38 (explaining that the "time and attendance fraud scheme" was why the plaintiff was "removed").  Thus, in this case, given the plaintiff's admissions that he was involved in time-and-attendance fraud while a supervisor at EPA, the question is whether the inference of discriminatory animus that the plaintiff seeks the Court to draw from the underlying factual allegations are still even plausible.  *See Nurriddin v. Bolden*, 818 F.3d at 757 (dismissing disability discrimination claims since "[u]pon review of the record,

we find that [plaintiff] essentially 'plead[ed] himself out of court by alleging facts that render

success on the merits impossible.'" (quoting *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193

(D.C. Cir. 2006) (*citing Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1116 (D.C. Cir.

2000))).

The Court is cognizant of the "elusive" nature of intentional discrimination, *Tex. Dep't of

Cmty. Affairs v. Burdine*, 450 U.S. at 254-55, and that "clever men may easily conceal their

motivations," *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1043 (2d Cir. 1979) (internal

quotation marks omitted). Yet, in making the plausibility determination, the Court is to "draw on

its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. Unlike his termination, the

first challenged employment decision—the plaintiff's "demotion"— does not have an express

connection to the results of an investigation into any alleged misconduct. Instead, the complaint

indicates that the demotion was part of an "office reorganization," FAC ¶ 127, intended "to

reflect a younger, more 'diverse' management group," *id.* ¶ 90.

The agency defendants argue that "although the circumstances surrounding any

constructive demotion are not entirely clear from the allegations in the complaint, given the

totality of those allegations, the reasonable inference is that any constructive demotion was a

result of Townsend's admitted participation in wrongdoing, just as was his removal." Agency

Defs.' Reply Supp. Mot. Dismiss, at 4-5, ECF No. 45. The Court agrees that this is a

"reasonable inference." After all, by the time of the alleged discriminatory statement at issue

and of his subsequent constructive demotion, the investigations into the plaintiff by the OIG and

the DC-USAO were already well under way. *See* FAC ¶¶ 40, 42-44 (noting the investigation

began on July 3, 2012); *id.* ¶ 58 (discussing OIG's "criminal referral" of the plaintiff's case to

the DC-USAO); *id.* ¶ 69 (discussing the April 23, 2013 debriefing held by DOJ). Hence, this

timing supports the reasonable inference that the plaintiff was demoted, and his managerial responsibilities removed, because of concerns regarding the plaintiff's supervisory misconduct.

At the motion-to-dismiss stage, however, the question is not whether "the true cause" of the adverse personnel action was a legitimate, non-discriminatory reason, *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 70 (D.C. Cir. 2015), but, in the face of an allegedly direct discriminatory statement, the focus must be on whether the plaintiff has alleged enough facts to "'state a claim to relief that is plausible on its face,'" *Nurriddin v. Bolden*, 818 F.3d at 756 (quoting *Iqbal,* 556 U.S. at 678). Thus, while the inference may reasonably be drawn that the plaintiff's demotion was because of the ongoing investigations of the plaintiff's involvement in time-and-attendance fraud, "constru[ing all] reasonable inferences from th[e] allegations in [the] plaintiff's favor," *id.* (citing *Sissel v. U.S. Dep't of Health & Human Servs.,* 760 F.3d 1, 4 (D.C. Cir. 2014)), the blatant reference to age in the supervisor's remark makes it at least plausible that age was a "factor" in the plaintiff's demotion and, as he alleges, the reorganization of the Risk Assessment Division was designed "to 'sweep' older managers from their positions under the pretext of a so-called 'staffing plan.'" FAC ¶ 91. *See Harris v. D.C. Water & Sewer Auth.*, 791 F.3d at 70-71) (reversing district court's dismissal of discrimination claims, despite complaint's allegations of facts relating to medical leave, which may reasonably be "the true cause of his termination" and may "be enough to rebut [plaintiff's] retaliation claim," because the court's role at the motion to dismiss stage "is not to speculate about which factual allegations are likely to be proved after discovery" and "[t]he only question before us is whether [plaintiff] alleged facts that, taken as true, render his claim of retaliation plausible").

The agency defendants attempt to deflect the impact of the alleged discriminatory statement by Henry by noting that "[i]t is not clear from the amended complaint whether Henry

had actual hiring and firing authority over Townsend, or whether she was responsible for making the decision regarding his removal."  Agency Defs.' MTD at 8.[11]  This effort to focus on the precise supervisory role of the person making the alleged discriminatory statement is not persuasive, however.  The D.C. Circuit has expressly cautioned lower courts against discounting discriminatory statements "not made in the direct context" of the challenged employment action. *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152-53 (2000)).  To be sure, at the summary judgment stage, the D.C. Circuit has held that a single statement by a person uninvolved in the employment decision is often not enough for a jury to infer discrimination.  *See, e.g.*, *Hampton v. Vilsack*, 685 F.3d 1096, 1101 (D.C. Cir. 2012) (affirming summary judgment for an employer where the adverse employment actions at issue occurred four and five years after a discriminatory remark by someone uninvolved in those decisions); *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 654-55 (D.C. Cir. 2003) (affirming summary judgment for an employer where a plaintiff "allude[d] to a racially degrading e-mail sent out by a single" employee uninvolved in the

---

[11]     In support of their argument, the agency defendants cite *Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP* ("*Gross*"), 599 F. Supp. 2d 23, 26-27 (D.D.C. 2009), but this case is inapposite for at least two reasons.  First, *Gross* is a private-sector case and, thus, to prevail the plaintiff would have to prove that age was the "but-for cause of the challenged employer decision."  *DeJesus v. WP Co. LLC*, 841 F.3d 527, 532 (D.C. Cir. 2016) (internal quotation marks and citation omitted).  By contrast, as noted above, in a federal-sector case, a plaintiff need only show that age was a "factor" in the employment decision.  *Ford v. Mabus*, 629 F.3d 198, 205 (D.C. Cir. 2010).  Second, *Gross* considered a motion for summary judgment, not a motion to dismiss.  Thus, in *Gross*, the employer was able to "submit[] evidence in the record which overwhelmingly demonstrate[d] that [the plaintiff] was terminated because he failed to meet the terms of his contract."  599 F. Supp. 2d at 30.  Further, the employer showed that the individual who made the alleged discriminatory remarks was not involved in the termination decision.  Instead, the employer conducted an independent assessment of the plaintiff's performance and, as the court noted, "the D.C. Circuit has repeatedly upheld grants of summary judgment in discrimination cases where the decision-maker completed an independent assessment of the relevant facts and made an independent decision to terminate an employee."  *Id.* (citing *Vickers v. Powell,* 493 F.3d 186, 195-96 (D.C. Cir. 2007); *Hall v. Giant Food, Inc.,* 175 F.3d 1074, 1079 (D.C. Cir. 1999)).  By contrast, this case is at the motion-to-dismiss stage and the parties have not yet engaged in discovery regarding Henry's actual authority to demote the plaintiff and her involvement in the challenged personnel decisions.  At this stage the plaintiff's allegation that, as a putative supervisor, Henry had such authority is sufficient to withstand the motion to dismiss on the challenged demotion.

adverse employment action); *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1079-80 (D.C. Cir. 1999)

(holding that evidence of a discriminatory statement by someone not involved in the adverse

employment action is insufficient to defeat a motion for summary judgment).

Yet, the procedural posture of this case is different since discovery has been limited to

administrative proceedings and the claims here are subject to evaluation under the standard

applicable to a motion to dismiss.  The plaintiff has alleged enough facts to push his claim of age

discrimination being a factor in his demotion into the realm of plausible because Henry, as the

plaintiff's "putative supervisor," allegedly played some role in his constructive demotion and

allegedly made a direct statement supporting an inference of age discrimination.  Specifically,

according to the FAC, Henry not only originally asked the plaintiff to "step aside" but then

subsequently, as the plaintiff characterizes it, "strong-arm[ed]" the plaintiff into accepting the

demotion.  FAC ¶ 128.  Thus, the plaintiff has sufficiently stated a claim that age discrimination

may have been a factor in the decision to demote the plaintiff and strip him of his management

responsibilities and then discharge him.  Count I, therefore, survives the motion to dismiss as to

this part of the claim.

### *ii. The Plaintiff's Termination*

The plaintiff appears to rely on Henry's statement to him "to **'step aside' as branch

chief in order to make room for 'younger' employees**," FAC ¶93 (emphasis in original), as

support for an inference that the plaintiff's removal from federal service was also discriminatory

based on his age.  *See id*. ¶ 126.  No plausible inference can be drawn from this statement,

however, that the plaintiff's termination was due to age discrimination for at least two reasons.

First, whereas Henry's statement was at least related to the plaintiff's "constructive

demotion," that statement has no plausible causal relationship to the plaintiff's termination.

Nowhere in the FAC does the plaintiff even suggest that Henry played a role in the decision to terminate the plaintiff. *See generally* FAC. To the contrary, the plaintiff explains that Louise Wise was the "Proposing Official" for his removal and that Jim Jones was the "Deciding Official," *id.* ¶¶ 5, 6, 25-26, 85-86, 97, 152, and that they acted on direction of Administrator McCarthy and her senior deputies, *id.* ¶ 88 ("Administrator McCarthy and Perciasepe gave the order to terminate plaintiff"); *id.* ¶ 99 ("Administrator McCarthy ordered Jim Jones to formally remove Plaintiff"). Thus, although a plausible inference can be made that Henry played a role in the plaintiff's demotion, no such inference can be drawn with respect to his termination, which occurred more than a year after Henry asked the plaintiff to "step aside" as branch chief. *Id.* ¶¶ 93, 99.

Second, unlike the plaintiff's demotion—for which Henry's statement in combination with allegations regarding the purpose of the reorganization plan makes a claim of age discrimination at least plausible at this stage of the case—the factual allegations, considered collectively, make abundantly clear that the EPA's proffered reason for the plaintiff's termination was his supervisory role in time-and-attendance fraud. Not only does the plaintiff admit that he participated in time-and-attendance fraud, *see id.* ¶¶ 57, 67, the FAC also explains that Monell's Report of Investigation concluded that the plaintiff was "'guilt[y]' in a 'time card fraud' scheme," *id.* ¶ 5, which, the plaintiff explains, resulted in "a recommendation of adverse action against Plaintiff," *id.* at 85 ¶ 152. Further, although the plaintiff claims these investigations served as "pretext" for his removal, *id.* ¶ 7, 15, 37, he alleges that his termination was driven by a motivation having nothing to do with his age: to "scapegoat" the Plaintiff and "deflect[] attention from John Beale." *Id.* ¶ 80; *see also id.* ¶ 62 ("EPA upper management sought political cover (for themselves and their political benefactors) by scapegoating Plaintiff

with their (rather convenient) pretextual misfeasance"); ¶ 81 ("Administrator McCarthy was being deservedly excoriated in the media and before Congress for her role in the John Beale debacle - and, upon information and belief, was looking for a sacrificial scapegoat to deflect attention from her own wrongdoing."); *id.* ¶ 6 (alleging that Hernandez "was not disciplined despite his full and complete culpability in the wrongdoing for which Plaintiff has been scapegoated").

Thus, to the extent the plaintiff seeks to rely on Henry's statement to support an inference that age played a role in his termination, such an inference is rendered implausible by the totality of his allegations.  The complaint makes no effort to connect Henry or Henry's statement to his termination.  Most importantly, the complaint describes how the EPA concluded that the plaintiff was guilty of time-and-attendance misconduct after exhaustively investigating him for nearly two years.  Although the plaintiff laments that the investigations included "fabricated claims" and "false statements," the plaintiff admits that he did, in fact, participate in time-and-attendance malfeasance as a supervisor at the EPA.  Finally, although the plaintiff makes the conclusory assertion that these investigations served as "pretext," that assertion is undercut by his repeated allegations that the real motivation for his removal was political, not discrimination: to provide "political cover" for McCarthy and EPA upper management by "scapegoating Plaintiff," *e.g.* ¶ 81, for what he describes as "the culture of corruption and myriad malfeasance concerning time and attendance fraud," within the agency, *id.* ¶ 81. The plaintiff has effectively pleaded himself out of court "by alleging facts that render success on the merits impossible." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 11at 1116; *see also Nurriddin*, 818 F.3d at 757.  Although Henry's statement may support an inference that age played a role in his demotion, it cannot support a plausible inference that age played a role in his termination.  Assuming the truth of the totality of

the factual allegations in the complaint, such an inference is not reasonable and plausibly supported. *See Nurriddin*, 818 F.3d at 757 (court "need not, however 'accept inferences drawn by [a] plaintiff[] if such inferences are unsupported by the facts set out in the complaint.'" (quoting *Kowal v. MCI Communications Corp.*, 16 F.3d at 1276).

Accordingly, to the extent Count I also claims age discrimination with respect to plaintiff's termination, that portion of the claim is dismissed.

### c.  Count II

The plaintiff claims in Count II that the EPA had a "*De Facto* Policy," FAC Count II at 64, of "target[ing] older, more experienced personnel and subject[ing] them to disparate treatment, continuing hostile work environments, intolerable working conditions, and prohibited personnel practices considered constructive adverse actions." *Id.* ¶ 137.  Although not articulated at such, Count II appears to be a "pattern or practice" disparate treatment claim.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (discussing so-called "pattern or practice" disparate treatment claims); *see also Aliotta v. Bair*, 614 F.3d 556, 562 (D.C. Cir. 2010) (explaining that "[d]isparate treatment claims brought under the ADEA may involve 'an isolated incident of discrimination against a single individual, or . . . allegations of a "pattern or practice" of discrimination affecting an entire class of individuals.'" (quoting *Palmer v. Shultz,* 815 F.2d 84, 90 (D.C. Cir. 1987)); *Schuler v. PricewaterhouseCoopers, LLP,* 514 F.3d 1365, 1370 (D.C. Cir. 2008) (applying the *Teamsters* framework to the ADEA).  Evidence of a widespread imbalance in protected classes is "often a telltale sign of purposeful discrimination; absent explanation." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. at 339 n.20.  In order to make out a *prima facie* case of a pattern or practice claim, a plaintiff must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts" and instead establish

that "discrimination was the [employer's] standard operating procedure—the regular rather than the unusual practice." *Id.* at 336.

The facts as alleged in the complaint do not give rise to a plausible inference of a regular practice of age discrimination at the EPA. Plaintiff's naked assertion that "myriad other older similarly-situated workers subject to the same supervisory chain of command[] were treated in the same or highly similar manner" as the plaintiff, FAC ¶ 139, is, without more, conclusory, and cannot support an inference that age discrimination was the EPA's "standard operating procedure." Indeed, the plaintiff fails to identify even one other individual whom he alleges was subject to the purported practice of removing older employees. Moreover, the allegedly direct discriminatory statement made by the plaintiff's putative supervisor that the plaintiff should "**step aside as branch chief in order to make room for 'younger' employees**," FAC ¶ 128 (emphasis in original), was directed at the plaintiff and does not support a broader inference of a pattern of age discrimination.

Accordingly, Count II is dismissed.

### d. Count V

In Count V, the plaintiff asserts another claim of "disparate treatment" based on age, *see* FAC at 69-70, due to the allegedly less favorable treatment of him as compared to Elizabeth Craig, a "younger female," *id.* ¶ 162, who "fraudulently approved time, performance agreements and awards, attendance and inordinate expenses for John Beale" but "suffered no consequences," *id.* ¶ 38 (emphasis omitted). The plaintiff complains that while he was demoted and ultimately

terminated, Craig "was treated with kid gloves and not subjected to the same level of scrutiny," *id*. ¶ 162, and promoted "and allowed to retire with a higher pension," *id*. ¶ 37.

"A plaintiff can establish pretext masking a discriminatory motive by presenting evidence suggesting that the employer treated other employees of a different [protected class] more favorably in the same factual circumstances." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (internal quotation marks and citation omitted)); *see also Brady v. Office of Sergeant at Arms*, 520 F.3d at 495 ("Probably the most commonly employed method of demonstrating that an employer's explanation is pretextual is to show that similarly situated persons of a different race or sex received more favorable treatment.") (internal quotation marks and citation omitted).  To raise an inference of discrimination based on comparator evidence, the plaintiff must demonstrate: (1) that "all of the relevant aspects of [his] employment situation were nearly identical to those of the [other] employee"; and (2) that the comparator was "charged with offenses of comparable seriousness" but treated more favorably.  *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d at 301 (citing *Holbrook v. Reno,* 196 F.3d 255, 261 (D.C. Cir. 1999)); *see also Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115-16 (D.C. Cir. 2016) (citing *Burley*, 801 F.3d at 301).  "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley,* 801 F.3d at 301.

As support for his disparate treatment claim using Craig as a comparator, the plaintiff alleges that "Craig and Plaintiff held similar management jobs requiring them to approve and certify time and attendance." *Id.* ¶ 155; *see also id.* ¶ 62 ("Craig . . . approved Beale's time and attendance, as well as exorbitant travel and awards.").  Nonetheless, even assuming these

allegations to be true, other allegations made by the plaintiff demonstrate that they are not similarly situated and, consequently, any difference in treatment between Craig and the plaintiff cannot give rise to a plausible inference of discrimination.

At the outset, notably, the plaintiff does not plead Craig's age.  Thus, no inference can be drawn that Craig was "significantly younger" than the plaintiff, undercutting any inference that age was a factor for any alleged disparate treatment between Craig and the plaintiff.  *See, e.g.*, *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) (stating that an inference of age discrimination "cannot be drawn from the replacement of one worker with another worker insignificantly younger").

More significantly, however, even if Craig were assumed to be "significantly younger," the plaintiff admits that Beale, whom Craig supervised, misled her "into believing he was on assignment for the Intelligence Community."  FAC ¶ 61; *see* Agency Defs.' MTD at 10.  By contrast to Craig's situation, the plaintiff admits that he approved time-and-attendance records that he knew were fraudulent in at least three of his branch chief assignments at the EPA.  FAC ¶ 57.  He discusses the fact that two "consecutive Division Directors," *id.* at ¶ 68, one of whom the plaintiff describes as "fraudulent and corrupt," *id.* ¶ 6, "instructed Plaintiff that EPA practice was to 'not waste time' assigning work to low performing employees, but to sign time cards indicating such employees were available to work," *id.* ¶ 68.  Yet, during his entire supervisory career at the EPA, the plaintiff apparently never questioned this practice until he was already under investigation by both the EPA and DOJ.  *See id.* ¶ 67.  Notwithstanding this significant difference between the plaintiff's admitted complicity in time-and-attendance fraud within EPA compared to Craig being deceived by a subordinate's fraudulent actions, both the plaintiff and Craig were treated identically when both their cases were "examined in the context of the same

31

Inspector General investigation," *id*. ¶ 162, and referred to DOJ for a criminal investigation, *id*. ¶ 37.  Like the plaintiff, Craig was ultimately not charged with any criminal wrongdoing, but they were both subject to similar external scrutiny.

In sum, the plaintiff has not shown facts giving rise to plausible inferences (1) that he and Craig are significantly different in age; (2) that he was treated less favorably than Craig for reason of his age; or (3) that they were charged with offenses of "comparable seriousness." Instead, the plaintiff makes clear that whereas Craig was misled by her subordinate, he knowingly facilitated fraudulent time-and-attendance reporting at the EPA.  In other words, the plaintiff has been "hoist[ed] with his own petard."  WILLIAM SHAKESPEARE, HAMLET 183 (Folger Library ed., 2003).  Given the inculpatory evidence about the plaintiff's behavior in the FAC, any difference in treatment between Craig and the plaintiff simply does not give rise to a conceivable, let alone plausible, inference that the EPA's "asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against" the plaintiff when it terminated his employment.  *Brady v. Office of Sergeant at Arms*, 520 F.3d at 494. Accordingly, Count V is dismissed.

### e.  Count VIII

In Count VIII for disparate impact, the plaintiff alleges that "Cleland-Hamnett and Henry put in place an employment practice approved by Defendant Jones of promoting younger, more diverse management candidates."  FAC ¶ 171.  Although the plaintiff does not make an express reference to the "office reorganization" that formed the basis for his claim in Count I, the plaintiff appears to argue that this reorganization could be construed as a facially neutral policy that had a "disparate impact" "of discriminating against older, more experienced employees . . . ."  *Id.*  Indeed, "[p]laintiffs alleging age discrimination in violation of the ADEA

may seek recovery under both disparate treatment and disparate impact theories of recovery."

*Aliotta v. Bair*, 614 F.3d at 561 (D.C. Cir. 2010) (citing *Smith v. City of Jackson, Miss.*, 544 U.S.

228, 236-40 (2005)).   Nonetheless, unless the plaintiff alleges a "facially neutral employment

policy[,] . . . his claim sounds only in terms of disparate treatment."  *Schuler v.*

*PricewaterhouseCoopers, LLP*, 421 Fed. App'x 1, 2 (D.C. Cir. 2011); *see also Smith v. City of*

*Jackson*, 544 U.S. at 239 (explaining that disparate impact claims "involve employment practices

that are facially neutral in their treatment of different groups but that in fact fall more harshly on

one group than another"  (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 335-36)).

     The plaintiff repeatedly asserts that the office reorganization was intentionally

discriminatory against older employees.  *See* FAC ¶ 90 (explaining that the office reorganization

was intended "to reflect a younger, more 'diverse' management group); *id.* ¶ 91 (stating that the

reorganization of the Risk Assessment Division was designed "to 'sweep' older managers from

their positions under the pretext of a so-called 'staffing plan.'").  Even assuming, however, that

the office reorganization policy was "facially neutral," the plaintiff's claim still fails because he

offers no statistical or other evidence to support his claim that the policy had a disparate impact

on older employees.

     The plaintiff identifies no other person affected by reason of age by the reorganization.

Moreover, he offers no statistical or even anecdotal examples of such evidence.  Instead, he

merely states that "data regarding the impact of the . . . policy is still outstanding," *Id.* ¶ 176.

"[T]o sustain a disparate impact claim," however, "a 'plaintiff must generally demonstrate with

statistical evidence that the practice or policy has an adverse effect on the protected group.'"

*Jianqing Wu v. Special Counsel*, No. 14-7159, 2015 WL 10761295, at *1 (D.C. Cir. Dec. 22,

2015) (quoting *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban*

*Dev.*, 639 F.3d 1078, 1085-86 (D.C. Cir. 2011)).  "Although neither prima facie proof nor detailed factual allegations are necessary to withstand a Rule 12(b)(6) motion, a complaint must nonetheless contain factual content that allows the court to draw the reasonable inference that the defendant is liable" for the claimed misconduct; it "must be enough to raise a right to relief above the speculative level." *Id.* (internal quotation marks and citations omitted).  Complaints that fail even to include a "hint that [the plaintiff] has or can obtain statistical evidence" of a disparate impact are insufficient and mere "anecdotal evidence . . . would not—under [D.C. Circuit] case law—permit a reasonable inference of disparate impact." *Id.* at *2; *see also Krodel v. Young*, 748 F.2d at 709 ("Statistical evidence is crucial in disparate impact cases, where plaintiffs need not prove discriminatory intent, but must show that specific employment practices 'select applicants . . . in a racial pattern significantly different from that of the pool of applicants.'"  (quoting *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)).  Set against these legal requirements for an adequate disparate impact claim, the plaintiff's allegations fall far short.  Accordingly, Count VIII is dismissed.

### 2.  Race and Sex Discrimination: Counts III, IV, VI, and VII

In Counts III, IV, VI and VII, the plaintiff asserts violations of Title VII for race and sex discrimination.  The plaintiff alleges that he was treated less favorably than other similarly-situated employees on account of his race and sex.  The legal standard for a Title VII claim is summarized first, followed by an assessment of each of the plaintiff's claims.

### a.  Legal Standard

Under Title VII, the federal government may not discriminate against employees on the basis of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e–16(a).  "[T]he two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse

employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin."
*Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  Just as for an ADEA claim, a

plaintiff need not plead facts establishing a *prima facie* Title VII case to survive a motion to

dismiss.  *See Brady v. Office of Sergeant at Arms*, 520 F.3d at 493 ("At the motion to dismiss

stage, the district court cannot throw out a complaint even if the plaintiff did not plead the

elements of a prima facie case.").  Further, an inference of discrimination may be drawn where

an "employer treated other employees of a different race, color, religion, sex, or national origin

more favorably in the same factual circumstances."  *Id.* at 495.  Analysis of Counts III, IV, VI,

and VII follow.

### b.  Count III

The plaintiff alleges, in Count III, that he "received less favorable treatment because he is

male," relying on the fact that Craig and McCarthy, both females, were "given favorable

treatment."  FAC ¶ 153.  According to the plaintiff, both Craig and McCarthy "should have been

punished administratively and criminally for actions far worse than the Plaintiff was investigated

and removed for," primarily because of their alleged role in approving John Beale's time-and-

attendance records.  *Id.*  Construing the plaintiff's complaint broadly, the plaintiff appears to

offer both McCarthy and Craig as comparators who were treated more favorably in the same

factual circumstances because they were women.  The plaintiff's use of Craig as a comparator

fails for substantially the same reasons discussed *supra* in Part III.A.1.d., addressing Count V.

Likewise, McCarthy is simply not a plausible comparator.  McCarthy was the EPA

Administrator, FAC ¶ 23, whereas the plaintiff was a "middle-manager," *id.* ¶ 1, and "Senior

Science Advisor," *id.* ¶ 15.  Thus, regardless of McCarthy's role *vel non* in John Beale's time-

and-attendance fraud, McCarthy and the plaintiff's employment situations were plainly not even

close to "nearly identical." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d at 301. Thus, Count III is dismissed.

### c. Count IV

As support for his claim of race discrimination in Count IV, the plaintiff provides no obvious comparator of another race who was treated more favorably. *See* FAC ¶¶ 157-59 (Count IV). The plaintiff suggests elsewhere in his complaint that Hernandez was "allowed" to "retire," and alleges that this former supervisor was "clearly treated differently by the EPA because he was Hispanic," FAC ¶ 55. The plaintiff, however, also argues that Hernandez "would have" been subjected to "'pretextual discrimination' . . . if he only fit the 'older' profile of Plaintiff." *Id.* Thus, the plaintiff's admission that Hernandez would likely have been removed had he been older undermines any allegation that Hernandez was treated more favorably because of his race.

In any event, Hernandez is not a plausible comparator. According to the complaint, Hernandez retired prior to any investigation by EPA officials into time-and-attendance fraud at the EPA. *Id.* ¶ 46. The plaintiff also alleges that while the investigations were under way, Hernandez "disappeared to his family's native South American country – where he stayed secreted for several months." *Id.* ¶ 68. Thus, no plausible inference can be drawn that the plaintiff was treated less favorably on account of his race.

Nor does the plaintiff state a claim by alleging that he was "pressured . . . to step aside to provide headroom for two younger and less-qualified African-American females," including one who is "now encumbering the position from which Plaintiff was removed." *Id.* ¶ 4. Aside from some conclusory assertions, the plaintiff has not pleaded sufficient facts from which to draw a plausible inference that these individuals were less qualified. *Cf. Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (noting that an inference of age discrimination can be

36

drawn from a decision to replace an employee when that employee is "significantly better qualified for the job" than his or her replacement).  In any event, because the plaintiff concedes that he was terminated, at least in part, for his role in time-and-attendance fraud, the mere fact that his replacements were less qualified would not be sufficient to infer pretext.  Thus, no plausible inference can be drawn that he was terminated because of his race from the mere fact that his replacements were African-American.  For these reasons, Count IV is dismissed.[12]

### 3.  Hostile Work Environment: Count IX

The plaintiff alleges, in Count IX, that, in addition to the decisions to demote and ultimately terminate him, he was also subject to "intolerable" and hostile working conditions, in violation of both the ADEA and Title VII.  FAC ¶ 180.  The legal standard for a hostile work environment claim is summarized before assessing the plaintiff's claim.

### a.  Legal Standard

To survive a motion to dismiss a hostile work environment claim, the plaintiff must plausibly allege that his employer subjected him to "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).  "In evaluating a hostile work environment claim, the court 'looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance.'"  *Id.* (quoting *Baloch v. Kempthorne*, 550 F.3d at 1201 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998))); see also

---

[12]    Counts VI and VII allege "disparate treatment" based on race and sex respectively.  These counts, however, merely repeat the allegations in Counts III and IV, both of which allege "disparate treatment" under Title VII. Counts VI and VII do not purport to be based on a different law, nor do they assert any different or new evidence. Accordingly, they amount to mere surplusage and are dismissed for the same reasons as Counts III and IV.

*Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003).  The Supreme Court in

*Harris* explained that assessing whether a hostile work environment exists has both subjective

and objective components.  Thus, no violation can be shown "if the victim does not subjectively

perceive the environment to be abusive" and also if the conduct "is not severe or pervasive

enough to create an objectively hostile or abusive work environment."  *Harris*, 510 U.S. at 21-

22.  Further, "a plaintiff may not combine discrete acts to form a hostile work environment claim

without meeting the required hostile work environment standard."  *Baird v. Gotbaum*, 662 F.3d

1246, 1252 (D.C. Cir. 2011).

      In evaluating claims of a hostile work environment, the D. C. Circuit has cautioned that

"not all abusive behavior, even when it is motivated by discriminatory animus, is actionable."

*Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002) (citations and quotation marks omitted).

The Supreme Court has made it clear that Title VII does not establish a "general civility code for

the American workplace."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

Indeed, "Title VII does not prohibit all verbal or physical harassment in the workplace."  *Id.* at

80.  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will

not amount to" a hostile work environment.  *Faragher v. City of Boca Raton*, 524 U.S. at 788

(internal quotation marks and citations omitted); *see also EEOC v. Sunbelt Rentals, Inc.*, 521

F.3d 306, 315-16 (4th Cir. 2008) (noting that complaints about mere rude treatment, callous

behavior, or routine difference of opinion and personality conflict do not satisfy the severe or

pervasive standard of a hostile work environment claim under Title VII).  To "[prevent] Title VII

from expanding into a general civility code," the "crucial" requirement for a hostile work

environment claim is that the behavior complained of is "so objectively offensive as to alter the

conditions of the victim's employment."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. at

81; *see also Faragher v. City of Boca Raton*, 524 U.S. at 788 ("Conduct must be extreme to amount to a change in the terms and conditions of employment . . . ."). "Bosses may be harsh, unfair and rude, but conduct so characterized does not necessarily rise to the level of a Title VII violation." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012).

Finally, under the ADEA and Title VII, not all forms of workplace harassment are prohibited; only harassment that is based on a person's age, race, or sex is prohibited. *See, e.g., Stewart*, 275 F.3d at 1133. The "conduct at issue [must] not [be] merely tinged with offensive . . . connotations, but actually constitute[] discrimination . . . because of" the employee's protected status. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. at 81 (quotation marks and emphasis omitted).

### b.  Analysis

The plaintiff alleges that the following actions created a hostile work environment: (1) he was "constructively demoted," which led to him being "stripped of all duties and given duties well below his grade level"; (2) he was "moved into an office shared with one of his (former) staff"; and (3) he was "subjected to commentary by Henry such as 'how do you like your new little man cave,'" "'being on his way out,'" and "forc[ing] Plaintiff to step aside for younger employees who were African-American." FAC ¶ 180. After reviewing the "totality of the circumstances," *see Baloch,* 550 F.3d at 1201, the alleged conduct, even assumed to be true, is insufficient to give rise to an inference of a hostile work environment.

As an initial matter, the plaintiff's reliance on his "constructive demotion" to support his hostile work environment claim is unavailing. Use of the same discrete acts, upon which the plaintiff bases his discrimination and retaliation claims, to support a hostile work environment claim is disfavored. *See Peters v. District of Columbia*, 873 F. Supp. 2d at 191 (D.D.C. 2012)

39

(citing *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 56-57 (D.D.C. 2011) ("Plaintiff cannot, however, rely on the discrete acts upon which he bases his discrimination and retaliation claims to support a hostile environment claim."); *see also Franklin v. Potter*, 600 F. Supp. 2d 38, 76 (D.D.C. 2009) ("Because plaintiff's allegedly hostile events are the very employment actions he claims are retaliatory, he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim." (internal quotation marks and citations omitted)); *id.* at 77 ("Cobbling together a number of distinct, disparate acts will not create a hostile work environment, because '[d]iscrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim . . . .'" (quoting *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003)); *Wade v. District of Columbia.*, 780 F. Supp. 2d 1, 19 (D.D.C. 2011) (rejecting plaintiff's effort to transform amalgamation of disparate treatment claims into cause of action for hostile work environment for lack of connection in pervasive pattern of severe harassment).

Moreover, in order to succeed on a hostile work environment claim, the behavior complained of must be "so objectively offensive as to alter the conditions of the victim's employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. at 81. Although the plaintiff alleges he was "constructively demoted," all the other behavior allegedly contributing to the hostile work environment occurred after the demotion. *See* FAC ¶ 180. Hence, the plaintiff has provided no evidence that any of the other alleged acts by his supervisors or colleagues were so severe that they caused his demotion.

Second, the plaintiff's purported humiliation at having to share an office with a former subordinate simply does not amount to a hostile work environment. Federal anti-discrimination laws do not provide an avenue to complain about such "ordinary tribulations in the workplace."

*Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998).  "Not everything that makes an employee unhappy is an actionable adverse action."  *Broderick v. Donaldson*, 437 F.3d 1226, 1233 (D.C. Cir. 2006).  Consequently, confronted with similar complaints about office assignments, this Court has not hesitated to find an inadequate pleading of a hostile work environment.  *See, e.g.*, *Pearsall v. Holder,* 610 F. Supp. 2d 87, 98 n.10 (D.D.C. 2009) (dismissing claim where the plaintiff "argu[ed] that [the Department of Justice] created a hostile work environment by", *inter alia*, "assigning him substandard office space").

Finally, the plaintiff alleges that a number of comments by Henry made his working environment hostile. The most troubling of these comments is that he should step aside to make room for employees who were younger and African-American.  This statement does not render the plaintiff's hostile work environment claim plausible.  Such a single incident of an apparent discriminatory comment rarely creates a hostile work environment, which generally "involves repeated conduct."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); s*ee also Faragher v. City of Boca Raton,* 524 U.S. at 788 ("isolated incidents (unless extremely serious) will not amount to" a hostile work environment); *Brooks v. Grundmann*, 748 F.3d 1273, 1277 (D.C. Cir. 2014) (concluding that a single incident, where a supervisor "yelled at [the plaintiff] and violently threw a book (thick notebook) on a table)" did not "rise to the level of severity indicating hostility or abuse"); *Stewart v. Evans,* 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("Except in extreme circumstances, courts have refused to hold that one incident is so severe to constitute a hostile work environment.  Even a few isolated incidents of offensive conduct do not amount to actionable harassment.") (citation omitted); *Freedman v. MCI Telecomms. Corp.,* 255 F.3d 840, 848-49 (D.C. Cir. 2001) (single incident of "religious slander" does not create a hostile work environment).  To be sure, in *Ayissi-Etoh v. Fannie Mae*, the D.C. Circuit suggested that in

41

certain circumstances, use of a "deeply offensive racial epithet . . . might well . . . be[] sufficient to establish a hostile work environment." 712 F.3d at 577 (citing *Rodgers v. W.-S. Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir. 1993) ("[P]erhaps no single act can more quickly alter the conditions of employment" than "the use of an unambiguously racial epithet such as 'nigger' by a supervisor.") (internal quotation marks omitted)).   Nonetheless, in *Ayissi-Etoh*, the Circuit declined to hold that a single statement referring to the plaintiff as a "nigger" was enough. Instead, the Court observed that the hostile work environment was precipitated by two independent statements made by two different supervisors of the plaintiff.  *Id.* at 575, 577; *but see id.* at 579-80 (Kavanaugh, J., concurring) (recognizing that "cases in which a single incident can create a hostile work environment are rare" but stating, "in my view, being called the n-word by a supervisor—as Ayissi-Etoh alleges happened to him—suffices by itself to establish a racially hostile work environment."); *see also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 280 (4th Cir. 2015) (*en banc*) (concluding that "a reasonable jury could find that . . . two uses of the "porch monkey" epithet—whether viewed as a single incident or as a pair of discrete instances of harassment—were severe enough to engender a hostile work environment.").

Nothing resembling the kind of invidious and explicit discrimination in *Ayissi-Etoh* is alleged in this case.  To be sure, as noted, Henry's statement that the plaintiff "step aside" may support an inference that age was a "factor" in adverse employment actions for the purpose of a claim under Section 633a of the ADEA.  Nonetheless, Henry's statement is unlike the statements at issue in *Ayissi-Etoh*:  Standing alone, it is not so overtly discriminatory such that it "rise[s] to the level of severity indicating hostility or abuse" *Brooks v. Grundmann*, 748 F.3d at 1277.  The other comments allegedly made by Henry amount to no more than "mild slights [that] in no way approach the bar set for this type of cause of action; if they did, few workplaces would be

entirely immune." *Adams v. District of Columbia*, 50 F. Supp. 3d 47, 53 (D.D.C. 2014), *aff'd,* 618 F. App'x 1 (D.C. Cir. 2015).  "The facts underlying [the plaintiff's] claims seem more like the 'ordinary tribulations of the workplace,'" *Brooks v. Grundmann*, 748 F.3d at 1277-78 (quoting *Faragher v. City of Boca Raton,* 524 U.S. at 788), "a series of 'petty insults, vindictive behavior, and angry recriminations' that are not actionable under Title VII," *id.* (quoting *Bhatti v. Trustees of Boston Univ.*, 659 F.3d 64, 74 (1st Cir. 2011)).  Although the plaintiff has alleged comments by his supervisor that "may have been tactless and ill-mannered," and an office assignment he found demeaning, none of these acts "add materially to the alleged aura of hostility."  *Id.* at 1276-77.

Indeed, the D.C. Circuit has rejected hostile work environment claims with allegations far more severe than plaintiffs.  For example, in *George v. Leavitt,* 407 F.3d 405 (D.C. Cir. 2005), the Circuit upheld summary judgment for an employer where a black woman was "told by three separate employees to 'go back to Trinidad' or to 'go back to where [she] came from,'" where her "co-workers shouted at her, told her that she should never have been hired, and told her to 'shut up.'"  *Id.* at 408 (alteration in original).  These statements are certainly far more hostile and blatantly discriminatory than the conduct at issue in this case.  *See also Johnson v. Perez*, 66 F. Supp. 3d 30, 44 (D.D.C. 2014), *aff'd*, No. 15-5034, 2015 WL 5210265 (D.C. Cir. July 1, 2015) (rejecting a hostile work environment claim on summary judgment where the plaintiff alleged he was "humiliated" by a colleague "talking down to him 'as if he were a child,'" colleagues "yelled at or spoke angrily to him," and that "on one occasion, [a colleague] 'glared at him, balled up both of her fists, and threw two catalogs down towards' him."  (citations omitted and alterations adopted); *Badibanga v. Howard Univ. Hosp.,* 679 F. Supp. 2d 99, 104 (D.D.C. 2010) (dismissing a hostile work environment claim where the plaintiff was placed on leave because of

a false accusation, colleagues criticized his accent, he was told that he could easily be replaced with an American, and his supervisor told him that they would not hire other Africans); *Singh v. U.S. House of Representatives,* 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004) (rejecting a hostile work environment claim where an employer "humiliated [plaintiff] at . . . meetings," screamed at her in one instance, "told her to 'shut up and sit down'" in another instance, and treated her in a manner that was "constantly hostile and hypercritical").

Looking at the totality of the circumstances, the plaintiff alleges no set of facts showing that he was subject to more than the occasional remark that he found hurtful, nor does he allege any facts giving rise to an inference of a working environment "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21. Thus, Count IX is dismissed.

### 5.  Retaliation: Count X

The plaintiff contends, in Count X, that his termination was not only part of an "attempt by EPA upper management . . . to remove older employees in favor of a younger, more diverse body of line management," FAC ¶ 31, but also in retaliation for his protected complaints the EPA Office of Civil Rights ("OCR"), in violation of Title VII and the ADEA, *id.* ¶ 184-85. The plaintiff's retaliation claim is analyzed after review of the applicable law for retaliation claims.

### a.  Legal Standard

Title VII forbids an employer from retaliating against an employee because the employee engaged in protected activity by opposing unlawful employment practices or bringing discrimination charges under Title VII. *See* 42 U.S.C. § 2000e–3(a); *see also Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015). Retaliation claims are equally cognizable under the ADEA. *Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008) (holding that the federal-sector provision of the

ADEA "includes retaliation based on the filing of an age discrimination complaint"); *see also*

*Solomon v. Vilsack*, 628 F.3d 555, 559-60 (D.C. Cir. 2010).

In the absence of direct evidence of retaliatory intent, to succeed on a claim for retaliation

under Title VII or the ADEA, plaintiffs must show that they "1) engaged in a statutorily

protected activity; 2) suffered a materially adverse action by [their] employer; and that 3) a

causal connection existed between the two." *Nurriddin v. Bolden*, 818 F.3d at 758 n.6 (citing

*Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007)); *see also Allen v. Johnson*, 795 F.3d at

38-39 ("To prove unlawful retaliation, an employee must establish three elements: that she made

a charge or opposed a practice made unlawful by Title VII, that the employer took a materially

adverse action against her, and that the employer took the action because of her protected

conduct."); *Minter v. District of Columbia*, 809 F.3d 66, 70 (D.C. Cir. 2015) (noting that "[t]o

establish a retaliation claim, [a plaintiff] must show, *inter alia*, that there 'existed a causal link'"

between a termination and a protected activity (italics added)).

"Protected activities" include actions that fall under either the "opposition" or

"participation" clauses of § 2000e–3(a). The "opposition clause" protects an employee who

"communicates to her employer a belief that the employer has engaged in a form of employment

discrimination." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271,

276 (2009) (internal quotation marks omitted and alteration adopted). "[O]pposition activity

may be protected even though the employer's practices do not amount to a violation of Title

VII," but in such cases "the employee-plaintiff must have a good faith and reasonable belief that

the practices are unlawful" under that statute. *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d

19, 24 (D.C. Cir. 2013). The participation clause "bars retaliation against employees who

participate in a Title VII proceeding." *Morris v. McCarthy*, 825 F.3d at 673; *see also Brady v.*

*U.S. Capitol Police*, No. 15-CV-1299 BAH, 2016 WL 4186912, at *6 (D.D.C. Aug. 8, 2016)

(explaining that in the context of a Title VII claim, the D.C. Circuit has held that "[t]he

participation clause speaks in clear, absolute terms, and has accordingly been interpreted as

shielding recourse to the EEOC." (quoting *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012,

1019 (D.C. Cir. 1981) (emphasis omitted)).

 "Materially adverse actions" include harms that may not be strictly workplace- or

employment-related so long as "a reasonable employee would have found the challenged action

materially adverse." *Burlington N. & Santa Fe Ry. Co. v. White* ("*Burlington*"), 548 U.S. 53, 64,

68 (2006).  In other words, the challenged employment "actions must be harmful to the point that

they could well dissuade a reasonable worker from making or supporting a charge of

discrimination." *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015) (quoting *Burlington*,

548 U.S. at 68).  The challenged actions, however, cannot be mere "trivial harms," "petty

slights," and "minor annoyances." *Burlington*, 548 U.S. at 68.  Further, the employer must have

had "knowledge of [the] protected activity" prior to the challenged actions.  *See Morris v.

McCarthy*, 825 F.3d at 673 ("To establish either type of retaliation claim, an employee must have

engaged in protected participation or opposition activity about which the employer knew."

(citing *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) (noting that an employee's

supervisors "could not have retaliated against him unless they had knowledge of his protected

activity"))).

 As for the third requirement, a causal relationship may be inferred through temporal

proximity between the protected act and the adverse employment action.  See *Walker v. Johnson*,

798 F.3d 1085, 1092 (D.C. Cir. 2015) ("The temporal proximity between an employee's

protected activity and her employer's adverse action is a common and often probative form of

evidence of retaliation."); *see also Taylor v. Solis*, 571 F.3d 1313, 1322-23 (D.C. Cir. 2009).  If

the causation element is predicated on temporal proximity alone, however, that proximity must

be "very close."  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quoting *O'Neal v.*

*Ferguson Constr. Co.,* 237 F.3d 1248, 1253 (10th Cir. 2001) (citing cases finding spans of three

and four months too distant)); *cf. Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68-69 (D.C.

Cir. 2015) (reversing district court's dismissal of complaint while declining to "decide whether a

five-month time lag without more would be sufficient to render [plaintiff's] claim plausible

because his complaint alleged more" in support for the retaliation claim).

### b.  Analysis

In Count X, the plaintiff alleges his employment was terminated in retaliation for his

protected complaints the EPA Office of Civil Rights ("OCR").  FAC ¶ 185-86.  This allegation,

however, does not adequately state a claim because no plausible inference can be drawn of a

causal relationship between the protected activity and the plaintiff's termination.

The plaintiff is vague about when precisely he made his complaints to OCR.  Reading the

allegations generously suggests that the OCR complaints were made some time in 2013.  *See*

FAC ¶ 94 (stating that he "prospectively supplemented" his OCR complaints sometime around

September 6, 2013).  The plaintiff notes that his OCR complaints were consolidated in 2014, *id.*

¶ 89, and then, "[s]hortly after . . . [his] claims were investigated by EPA OCR," *id.* ¶ 186, the

plaintiff's employment was terminated on July 31, 2014, *id.* ¶ 96.  Inferring a causal relationship

between the plaintiff's OCR complaints in 2013 to his termination at least seven months later is

highly tenuous for two reasons.

First, assuming the plaintiff's filed OCR complaints sometime in 2013, he was not

terminated until July 2014.  This lengthy time lag between the events undercuts any inference of

a causal relationship. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. at 273 (explaining that in order to infer a causal relationship on the basis of "temporal proximity," the protected activity and the materially adverse action must be "very close" in time).

Second and most importantly, however, the plaintiff's allegations indicate that his complaints to OCR were made *after* McCarthy and Perciasepe had already given the order to terminate the plaintiff.  Specifically, he alleges that McCarthy and Perciasepe gave the order to terminate the plaintiff and then he was "was subject to months of continuing hostile work environment and disparate treatment" causing him to file complaints with OCR.  FAC ¶¶ 88-89; *see also id*. ¶ 81-82 (attributing to McCarthy an intent to find "a sacrificial scapegoat" and "to initiate an illegal investigation in support of removal proceedings regarding Plaintiff," which allegedly prompted "an(other) unconstitutional investigation of Plaintiff" by James Jones and Marty Monell in October, 2013).  Indeed, by the time he was terminated, the plaintiff had been investigated at least four times by both DOJ and the EPA for serious misconduct, which the plaintiff admits he committed.  *See* FAC ¶¶ 7, 8, 57, 67, 82.[13]  Hence, the plaintiff's own allegations that his removal was ordered early on by the EPA Administrator to make him a "scapegoat" for the conceded time-and-attendance fraud within the agency is impossible to reconcile with any inference of a causal relationship between the plaintiff's subsequent

---

[13]    Evaluation of the temporal proximity between the plaintiff's OCR complaints and his July 31, 2014 termination is hampered by the plaintiff's obfuscation of the timing of his protected activity in the FAC. Nevertheless, the D.C. Circuit's decision in *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65 (D.C. Cir. 2015), is instructive.  While declining to rule on whether a five-month gap between an employer's knowledge of protected activity and the plaintiff's termination "without more would be sufficient to render [the plaintiff's] claim plausible," the Court pointed to other allegations in the complaint, including that the plaintiff was "regularly commended for his work" and made "numerous contributions to the improvement of" the employer's operations, as bolstering the inference, at the pleading stage, that the challenged termination was retaliatory.  791 F.3d at 69 (internal quotation marks and citations omitted).  By contrast, here, not only does the plaintiff fail to allege any clear temporal proximity between his protected activity and his termination, his admitted participation in fraudulent activity as a supervisor at EPA does not bolster but rather renders more implausible that his termination was due to retaliation.

complaints to OCR and the decision to terminate the plaintiff's employment.  Accordingly, Count X is dismissed.

### 6.  Alleged Violation of the Privacy Act: Count XVIII

In addition to his discrimination claims against the EPA, the plaintiff claims that both agency defendants, the EPA and DOJ, violated the Privacy Act by disclosing "private information" obtained during the April 23, 2013 "debriefing" session with the DC-USAO to the EPA Office of General Counsel ("OGC").  FAC at 86 ¶ 154; *see also id.* ¶ 69.  The legal standard for a Privacy Act violation is discussed before assessing the plaintiff's claim.

### a.  Legal Standard

The Privacy Act of 1974, codified in part at 5 U.S.C. § 552a, "contains a comprehensive and detailed set of requirements for the management of confidential records held by Executive Branch agencies."  *F.A.A. v. Cooper*, 566 U.S. 284, 287 (2012); *see also Mobley v. C.I.A.*, 806 F.3d 568, 585 (D.C. Cir. 2015).  Among other things, the Privacy Act's nondisclosure provision prohibits federal agencies from "disclos[ing] any record which is contained in a system of records by any means of communication to any person . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."  5 U.S.C. § 552a(b); *see Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 156 (2011) (noting the Privacy Act's nondisclosure requirement)

The Privacy Act's nondisclosure requirement, however, is subject to twelve exceptions. *Id.* §§ 552a(b)(1)-(12).  Most applicable to this case is the "routine use" exception.  *Id.* § 552a(b)(3).  A routine use is defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected."  *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 144 (D.C. Cir. 1993) (quoting 5 U.S.C. § 552a(a)(7)).

This compatibility requirement is satisfied if a "concrete relationship or similarity, [or] some meaningful degree of convergence" exists "between the disclosing agency's purpose in gathering the information and in its disclosure." *Id.* (quoting *Britt v. Naval Investigative Serv.*, 886 F.2d 544, 549-50 (3d Cir. 1989)).[14]  Agencies must also publish in the Federal Register notice of the types of disclosures it may take pursuant to the routine use exception.  5 U.S.C. §§ 552a(b)(3), 552a(e)(4)(D)).  Thus, an agency seeking to invoke the routine use exception must satisfy both the "compatibility" and "publication" requirements of the Privacy Act.

### b.  Analysis

The plaintiff alleges DOJ ran afoul of the Privacy Act by "unlawfully disseminat[ing] to EPA OGC," FAC at 87 ¶ 155, information derived from the plaintiff's disclosures to DOJ in February 2013 and in a de-briefing session on April 23, 2013 to the DC-USAO regarding "EPA management personnel who had been responsible for the exact alleged indiscretions for which [the plaintiff] was being investigated." *Id.* ¶¶ 68-69.  According to the plaintiff, disclosure of this information led to "the initiation of the fourth in a series of illegal investigations by EPA OGC in April 2014," *id.* at 86 ¶ 154, and, ultimately, to "Jones and Wise – the Deciding and Proposing Officials" terminating the plaintiff, *id.; id.* at 88 ¶ 156 (blaming dissemination as leading "directly to another illegal (and biased) investigation by the Proposing Official in Plaintiff's removal action from EPA").

The plaintiff concedes that DOJ may provide certain information to the EPA under the routine use exception, but suggests that the disclosure's "purpose" was to "remov[e] Plaintiff

---

[14]      In *U.S. Postal Service*, the D.C. Circuit declined to "decide . . . the precise limitations created by section 552a(a)(7)'s compatibility requirement" outside the context of labor law.  9 F.3d at 146.  The court suggested, however, that the Third Circuit's "concrete relationship" test is too restrictive.  Consequently, satisfying the Third Circuit's test is "likely sufficient, even if not necessary, to establish 'compatibility' in this Circuit." *Lugo v. U.S. Dep't of Justice*, Civil No. 15-879 (RDM), 2016 WL 5929950, at *6 n.3 (D.D.C. Sept. 30, 2016).

from federal service." *Id.* at 86 ¶ 154.  The plaintiff, however, has not alleged any specific facts that plausibly support his claim that the "purpose" for the disclosure was so narrow in scope.[15]

To the contrary, based on the plaintiff's own allegations, the plain and plausible inference is that the "purpose" of DOJ's disclosure was to share information regarding time-and-attendance fraud at the EPA with responsible agency officials, who then initiated, by the plaintiff's count, a "fourth" investigation in April 2014. *Id.* at 86 ¶ 154.  In other words, the purpose of gathering the information was nearly identical to the purpose of its disclosure: to gather and evaluate information regarding time-and-attendance fraud at the EPA, including any participation in that fraud by the plaintiff.  If the purpose were as narrow and focused as the plaintiff alleges simply to remove him his EPA job, no fourth investigation would have been necessary and makes that claim implausible.

This type of dissemination of an agency record or information is a routine use and does not amount to a violation of the Privacy Act's nondisclosure requirement.  *See, e.g.*, *Ames v. U.S. Dep't of Homeland Sec.*, 153 F. Supp. 3d 342, 348 (D.D.C. 2016) (explaining that the routine use exception was satisfied where an agency's purpose in gathering information was "to inquire into misconduct by a government employee in a national security position" and the "purpose in *disclosing* the Report was precisely the same: to prevent such misconduct by that individual at another national agency"); *Reed v. Dep't of the Navy*, 910 F. Supp. 32, 41-45 (D.D.C. 2012) (finding that the compatibility requirement was met where the U.S. Navy investigated allegations of misconduct by one of its service members and then shared that information with the service member's other employer, a local police department); *Radack v. U.S. Dep't of Justice*, 402 F. Supp. 2d 99, 106 (D.D.C. 2005) (concluding that an agency's OIG's decision to turn over a

---

[15]     Nor has the plaintiff alleged any facts that the defendants failed to satisfy the publication requirement.

record of the plaintiff's misconduct to state bar authorities was "precisely in accordance with the

purpose for which it was collected" and "easily met" the compatibility requirement because the

investigation was conducted "to provide for the resolution of allegations of misconduct").

In short, even if the allegation that DOJ may have disclosed the information with an

intention to remove the plaintiff from his job is conceivable, the plaintiff has not inched his claim

"across the line from conceivable to plausible" to survive a motion to dismiss. *Twombly,* 550

U.S. at 570.  Accordingly, Count XVIII is dismissed.[16]

\*     \*     \*

In sum, all of the claims, except Count I, against the agency defendants are dismissed for

failure to state a claim upon which relief may be granted or for lack of subject matter jurisdiction

pursuant to Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure.  While Counts

II through X, XVII, and XVIII through XX are dismissed, Count I, which alleges that age

discrimination was a factor prompting his "constructive demotion" and the reorganization of an

---

[16]     In Count XVII, the plaintiff asserts a claim against the agency defendants under the Administrative Procedure Act, challenging his removal as well as the "EPA's adjudicatory process."  FAC at 82-86 ¶¶ 149-52.  This claim, however, is precluded by the Civil Service Reform Act of 1978 (the "CSRA"), 5 U.S.C. § 1101 et seq., which is both the "comprehensive" and the "exclusive . . . remedial regime for federal employment and personnel complaints."  *Nyunt v. Chairman, Broad. Bd. of Governors,* 589 F.3d 445, 448 (D.C. Cir. 2009) (citing *United States v. Fausto,* 484 U.S. 439, 443 (1988); *Grosdidier v. Chairman, Broad. Bd. of Governors,* 560 F.3d 495, 497 (D.C. Cir. 2009); *Filebark v. U.S. Dep't of Transp.,* 555 F.3d 1009, 1010 (D.C. Cir. 2009); *Fornaro v. James,* 416 F.3d 63, 66-67 (D.C. Cir. 2005); *Graham v. Ashcroft,* 358 F.3d 931, 933-35 (D.C. Cir. 2004); *Carducci v. Regan,* 714 F.2d 171, 172 (D.C. Cir. 1983)).  The D.C. Circuit has "long held that federal employees may not use the Administrative Procedure Act to challenge agency employment actions."  *Filebark v. U.S. Dep't of Transp.,* 555 F.3d at 1010; *see also Lacson v. U.S. Dep't of Homeland Sec.,* 726 F.3d 170, 175 (D.C. Cir. 2013) (noting that an "employee may not circumvent the CSRA process by bringing an APA challenge in district court" (citing *Nyunt v. Chairman, Broadcasting Board of Governors,* 589 F.3d at 448); *Am. Fed'n of Gov't Emps. v. Sec'y of Air Force,* 716 F.3d 633, 636 (D.C. Cir. 2013); *Grosdidier v. Chairman, Broad. Bd. of Governors,* 560 F.3d at 497 ("Federal employees may not circumvent the Act's requirements and limitations by resorting to the catchall APA to challenge agency employment actions.").  "Allowing employees to end-run the CSRA would undermine Congress's efforts to foster a 'unitary and consistent Executive Branch position on matters involving personnel action.'"  *Grosdidier,* 560 F.3d at 497 (quoting *United States v. Fausto,* 484 U.S. at 449).  The plaintiff also appears to challenge the conduct of certain individuals not named as defendants in this action, including a White House official, a United States Congressman, and a MSPB Administrative Law Judge.  FAC at 84-86 ¶ 152.  As these individuals are not parties to this lawsuit, however, these challenges are not properly before the court.  Accordingly, the plaintiff's APA claim in Count XVII is dismissed.

EPA division in which the plaintiff worked, as evidenced by an allegedly a direct discriminatory statement, may proceed.  The plaintiff's remaining claims against the individual defendants are discussed below.

### B.  CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

The plaintiff brings two sets of claims against the individual defendants.  First, the plaintiff asserts six separate claims against the individual defendants for alleged constitutional torts committed by EPA and DOJ officials, premised on the Supreme Court's decision in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  Second, he brings an action under 42 U.S.C. § 1983, alleging that his constitutional rights were violated by some of the individual defendants acting under the color of District of Columbia law.  In particular, the plaintiff alleges that various defendants (1) terminated the plaintiff's employment at the EPA in retaliation for whistleblowing, in violation of the First Amendment (Count XI); (2) conducted an unreasonable search and seizure during their investigation of the plaintiff, in violation of the Fourth Amendment (Count XII); (3) terminated his employment because of sex discrimination, in violation of the Fifth Amendment's Equal Protection clause (Count XIII); (4) failed to follow appropriate procedures during his termination resulting in a violation of his property rights under the Fifth Amendment (Count XIV); (5) inappropriately labeled the plaintiff a "criminal," thereby violating his liberty interests under the Fifth Amendment (Count XV); (6) failed to give him warnings during his July 3, 2012 interview as required by the Fifth Amendment and the Supreme Court's decision in *Garrity v. New Jersey*, 385 U.S. 493 (1967) (Count XVI); and (7) deprived him of his civil rights, in violation of 42 U.S.C. § 1983 (Count

XXI).  *See* FAC at 76-82 ¶¶ 124-147, 91-92 ¶¶ 169-174.  Counts XI-XVI are considered together

before turning to the § 1983 claim in Count XXI.

### 1. *Bivens* Claims: Counts XI-XVI

The individual defendants seek to dismiss all of the plaintiff's *Bivens* claims for two

primary reasons.  First, the individual defendants argue that the CSRA precludes the plaintiff's

claims under the First Amendment (Count XI), Fifth Amendment Equal Protection (Count XIII),

and Fifth Amendment Deprivation of Property (Count XIV).  Second, they argue that qualified

immunity bars the claims under the Fourth Amendment (Count XII) and Fifth Amendment

(Counts V and XVI).  For the reasons set forth below, the defendants are correct and Counts XI

through XVI are dismissed.

### a. The First Amendment (Count XI), Fifth Amendment Equal Protection (Count XIII), and Fifth Amendment Deprivation of Property (Count XIV) Claims Are Barred By The CSRA

In *Bivens*, the Supreme Court "recognized an implied private action, directly under the

Constitution, for damages against federal officials alleged to have violated a citizen's Fourth

Amendment rights."  *Meshal v. Higgenbotham*, 804 F.3d 417, 420 (D.C. Cir. 2015).  Following

*Bivens,* the Supreme Court recognized that federal courts "have discretion in some circumstances

to create a remedy against federal officials" for violations of other constitutional provisions.

*Wilson v. Libby,* 535 F.3d 697, 704-705 (D.C. Cir. 2008).  Courts, however, must "tread

carefully before recognizing *Bivens* causes of action when plaintiffs have invoked them in new

contexts," *Meshal v. Higgenbotham*, 804 F.3d at 421, and "must decline to exercise that

discretion where 'special factors counsel[] hesitation' in doing so."  *Wilson v. Libby,* 535 F.3d at

704.  "One [such] 'special factor' that precludes creation of a *Bivens* remedy is the existence of a

comprehensive remedial scheme."  *Id.* at 705.  That is, when "Congress has put in place a

comprehensive system to administer public rights, has 'not inadvertently' omitted damages

remedies for certain claimants, and has not plainly expressed an intention that the courts preserve

*Bivens* remedies," courts "must withhold their power to fashion damages remedies" pursuant to

*Bivens. Spagnola v. Mathis,* 859 F.2d 223, 228 (D.C. Cir. 1988) *rev'd on other grounds,*

*Hubbard v. EPA,* 949 F.2d 453, 467 (1991); *see also Schweiker v. Chilicky,* 487 U.S. 412, 429

(1988) (when "Congress has discharged that responsibility [to create a comprehensive

regime] . . . we see no legal basis that would allow us to revise its decision"); *True the Vote, Inc.*

*v. IRS*, 831 F.3d 551, 556-557 (D.C. Cir. 2016) (affirming dismissal of *Bivens* claim "in light of

the comprehensive remedial scheme").   In *Bush v. Lucas*, the Supreme Court expressly held that

the CSRA is precisely such a comprehensive statutory scheme.   462 U.S. 367, 388 (1983); *see*

*also Wilson v. Libby*, 535 F.3d at 705 (noting that in *Bush v. Lucas*, "the [Supreme Court] held

that the federal civil service laws were a 'special factor' that precluded additional *Bivens*

remedies").

        The plaintiff argues that "*Bush* is without consequence to the fact that the meager CSRA

does not appear to (or be intended to) in any way to implement [the plaintiff's] constitutional

guarantees."  Pl.'s Opp'n Indiv. Defs.' MTD at 13, ECF No. 42.  In the plaintiff's view, the

CSRA only covers "minor prohibited practices" but does not adequately address the "type of

constitutionally intertwined violations pleaded here."  *Id.*  If his constitutional claims are barred

by the CSRA, the plaintiff contends that the CSRA is unconstitutional and "anticipate[s] the

Supreme Court to sort this out in the normal course, as [the plaintiff] takes these claims

forward."  *Id.* at 8-9.  Whichever way this case proceeds, this Court is bound by precedential

decisions making clear that "it is the comprehensiveness of the statutory scheme involved, not

the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention."

*Spagnola v. Mathis*, 859 F.2d at 227; *see also Wilson v. Libby*, 535 F.3d at 705 (explaining that even though the CSRA "did not provide 'complete relief' to the plaintiff, [ ] the [Supreme] Court held that the special factors inquiry does 'not concern the merits of the particular remedy that was sought' or its completeness" (quoting *Bush v. Lucas*, 462 U.S. at 380, 388)).[17]  Thus, the CSRA precludes the plaintiff's *Bivens* claims in Counts XI, XIII, and XIV for violations of the First and Fifth Amendments, and these counts are dismissed for failure to state a claim.[18]

### b.  The Individual Defendants Are Entitled To Qualified Immunity With Respect To Counts XII, XV, and XVI

In Counts XII, XV, and XVI, the plaintiff alleges constitutional violations under the Fourth and Fifth Amendments.  In particular, in Count XII, the plaintiff contends investigators breached the Fourth Amendment by seizing and searching timesheets filed and maintained by his timekeeper.  *See* FAC ¶¶ 83, 131.  In Count XV, the plaintiff asserts that his liberty interests

---

[17]    The plaintiff argues in the alternative that "the individual defendants are accused of criminal and direct unconstitutional activity in conspiring to harm [the plaintiff] - not simply *Bush* and *Schweiker* denial of a *statutory right*."  Pl.'s Opp'n Indiv. Defs.' MTD at 14 (emphasis in original).  As the individual defendants rightly respond, however, the plaintiffs in *Bush* also sought a remedy for a constitutional violation of the First Amendment, not a "statutory right."  Indiv. Defs.' Reply Supp. MTD at 3, ECF No. 44 (citing *Bush v. Lucas*, 462 U.S. at 369).  Thus, the plaintiff's claim that *Bush* is limited to a claimed violation of a "statutory right" is unavailing.

[18]    The individual defendants further contend that, even if the CSRA did not preclude Count XIII—for violation of the Equal Protection Clause of the Fifth Amendment on the basis of sex discrimination— that claim would also be precluded by Title VII.  The individual defendants are correct.  Title VII is "the exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination."  *Brown v. Gen. Services Admin.*, 425 U.S. 820, 829 (1976).  In general, "[a]bsent a showing that Title VII provides inadequate protection for [a plaintiff's] rights, a federal employee urging unlawful discrimination is confined to actions under that statute.  Hence, a direct constitutional action by an employee against an agency of the United States or its officials would be foreclosed . . . ."  *Morris v. Washington Metro. Area Transit Auth.*, 702 F.2d 1037, 1040 (D.C. Cir. 1983) (citation omitted).  Consequently, "this circuit has repeatedly held that federal employees may not bring suit under the Constitution for employment discrimination that is actionable under Title VII."  *Ethnic Emps. of Library of Congress v. Boorstin*, 751 F.2d 1405, 1415 (D.C. Cir. 1985); *see also Wilson v. U.S. Dep't of Trans.*, 759 F. Supp. 2d 55, 63 (D.D.C. 2011) (holding that Title VII precludes *Bivens* claims for discrimination on the basis of race).  The plaintiff's claim based on the Equal Protection Clause of the Fifth Amendment is rooted in the exact same allegations of discriminatory conduct that give rise to his claims under Title VII and the ADEA.  *See* FAC ¶ 135 ("Plaintiff's reasonable expectation in continued employment was illegally and intentionally taken away in a disparate fashion when a similarly-situated younger comparator female, Beth Craig, was allegedly rewarded for her political expedience and allowed to retire after allegedly committing massive time and attendance fraud during and within the context of the employment of John Beale.").  Thus, the plaintiff's Fifth Amendment Equal Protection claim in Count XIII is precluded by both the CSRA and Title VII.

under the Fifth Amendment were violated because he was "falsely labeled as a 'criminal.'" *Id.* ¶

143.  Finally, in Count XVI, the plaintiff claims that that certain individual defendants failed to

give him certain warnings required under the Fifth Amendment and the Supreme Court's

decision in *Garrity v. New Jersey*, 385 U.S. 493.  The defendants allege that they are entitled to

qualified immunity with respect to all three claims.  The standard for qualified immunity is

summarized below and each of the plaintiff's claims are then assessed in turn.

### i.     Legal Standard

Government officials performing discretionary functions are protected by qualified

immunity and cannot be liable for damages unless they violate "clearly established statutory or

constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982).  In considering a defendant's assertion of qualified immunity, a court

proceeds in two steps.  First, "[t]aken in the light most favorable to the party asserting the

injury," the court asks whether "facts alleged show the officer's conduct violated a constitutional

right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If so, the Court then asks "whether [the] right

is clearly established" or, in other words, "whether it would be clear to a reasonable officer that

his conduct was unlawful in the situation he confronted."  *Id.* at 202.  Thus, "[t]he contours of the

right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *id.* ("[I]n the light of pre-

existing law the unlawfulness must be apparent.").  These two questions may be addressed in any

order.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### ii.     Count XII

In Count XII, the plaintiff claims a violation of the Fourth Amendment when EPA

official "seized" information from an EPA employee, who worked as the plaintiff's timekeeper

"during the course of the investigation ordered by Jim Jones." FAC ¶ 131. The only items that the plaintiff alleges were "searched," however, were government records in the form of timesheets required to be filed and maintained in the possession of the timekeeper. *See id.* ¶¶ 83, 131. A person must have "a legitimate expectation of privacy in the invaded place" to demonstrate Fourth Amendment protection in property. *Rakas v. Illinois*, 439 U.S. 128, 143, (1978). The Supreme Court has recognized that within the workplace context, "employees may have a reasonable expectation of privacy," *O'Connor v. Ortega*, 480 U.S. 709, 716 (1987), but, at the same time, such an expectation typically evaporates when information is "revealed to a third party, even if the information is revealed on the assumption that it will be used only for a limited purposed and the confidence placed in the third party will not be betrayed." *United States v. Miller*, 425 U.S. 435, 443 (1976); *see also United States v. Payner*, 447 U.S. 727, 731-33 (1980) (bank customer has no legitimate expectation of privacy in loan guarantee agreement stolen by government agents from briefcase of bank official); *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979) (telephone user has no legitimate expectation of privacy in the numbers dialed on telephone); *Miller*, 425 U.S. at 443 (1976) (bank depositor has no legitimate expectation of privacy in copies of checks and deposit slips retained by his bank); *Donaldson v. United States*, 400 U.S. 517, 522 (1971) (employee has no Fourth Amendment interest in the employment records of his employer).

As the individual defendants correctly contend, because the "timesheets were in the possession or control of a third party—namely, [the plaintiff's] 'timekeeper'—[he] had no reasonable expectation of privacy in them." Indiv. Defs.' MTD at 14, ECF No. 37 (citing *Smith v. Maryland*, 442 U.S. at 743-44 ("This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."));

*Stewart v. Evans*, 351 F.3d 1239, 1245 (D.C. Cir. 2003) (noting a plaintiff has no reasonable expectation in materials given to a third party).

Thus, because the plaintiff had no reasonable expectation of privacy in the timesheets, no Fourth Amendment search occurred, and *ipso facto*, there was no violation of constitutional right, let alone a clearly established one. *See Kyllo v. United States*, 533 U.S. 27, 33 (2001) (explaining that where an individual does not have a reasonable expectation of privacy, "a Fourth Amendment search does not occur"). Accordingly, Count XII is dismissed.

### iii.   Count XV

In Count XV, the plaintiff alleges that he was "falsely labeled as a 'criminal'" and "thus permanently stigmatized as a 'criminal,'" FAC ¶ 143. Plaintiff's protestations that he was "falsely labeled as a 'criminal'" do not give rise to a violation of the Fifth Amendment's Due Process Clause since such an alleged reputational harm falls short of violating the Constitution. *Paul v. Davis*, 424 U.S. 693, 711 (1976); *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 121 (D.C. Cir. 2010) ("[S]tigma alone is insufficient to invoke due process protections."); *see also Siegert v. Gilley,* 500 U.S. 226, 234 (1991) ("[S]o long as . . . damage flows from injury caused by the defendant to a plaintiffs reputation," no constitutional claim is alleged). The D.C. Circuit has only allowed Fifth Amendment stigma cases to proceed when the plaintiff's allegations satisfy the requirements of the "stigma-plus rule" set out in *Paul v. Davis.* Under this standard, plaintiffs must show, in addition to some reputational harm, that "(1) the government has deprived them of some benefit to which they have a legal right . . . or (2) the government-imposed stigma is so severe that it broadly precludes plaintiffs from pursuing a chosen trade or business," *Gen. Elec. Co.*, 610 F.3d at 121 (internal quotation marks and citations omitted). The plaintiff claims he was "professionally ostracized and impugned" and "cannot find work for

which he is overqualified," FAC ¶ 4.  These claims are rendered hollow, however, in light of the

fact that the plaintiff publicly disclosed his involvement in time-and-attendance fraud by

volunteering to describe his experiences to the *Wall Street Journal.  Id.* ¶¶ 76-77.  Thus, the

plaintiff effectively impugned himself and cannot complain now that the EPA's actions imposed

any additional stigma that would give rise to a constitutional violation.  In any case, the

plaintiff's assertions are so vague and insufficiently specific that they cannot give rise to a

plausible inference that the "stigma is so severe that it broadly precludes plaintiff[] from

pursuing a chosen trade or business."  *Gen. Elec. Co.*, 610 F.3d at 121 (internal quotation marks

and citations omitted).  Thus, Count XV is dismissed.

### iv.    Count XVI

In Count XVI, the plaintiff claims that the individual defendants violated the standard set

forth in *Garrity v. New Jersey*, 385 U.S. at 500, which "prohibits use in subsequent criminal

proceedings of statements obtained under threat of removal from office." *See* FAC at 82 ¶ 147.

This prohibition is based on the obvious fact that a person's choice to either forfeit a job or to

incriminate him or herself is unduly coercive and is "likely to exert such pressure upon an

individual as to disable him from making a free and rational choice." *Garrity*, 385 U.S. at 497.

Nonetheless, even assuming a plaintiff was "threatened with termination" and "subjectively []or

reasonably believed his statements were compelled," *Garrity* only prevents the use of any

statements obtained through such coercion in a subsequent prosecution. *United States v. Cook*,

330 F. App'x 1, 2 (D.C. Cir. 2009).  "Where such use of the statements has not occurred, the

plaintiff may not sue because he has not suffered the injury against which the Fifth Amendment

protects." *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005).  In other words, a

*Garrity* violation does not by itself give rise to a substantive right.  Rather, *Garrity* only prohibits

the use of any statements obtained through the threat of removal in a subsequent criminal prosecution.  Although the U.S. Attorney's Office initially began an investigation into possible criminal violations by the plaintiff, as the plaintiff admits, this investigation was eventually dropped.  *See* FAC ¶¶ 74-75.  Accordingly, no constitutional violation has been validly asserted and Count XVI is dismissed.

## 2.   Civil Rights Claim Under Section 1983: Count XXI

In Count XXI of his complaint, the plaintiff alleges that defendants Machen, Cohen, Smith and Kaminsky "caused Plaintiff to be subjected to the deprivation of his Constitutional rights . . . pursuant to 42 U.S.C. § 1983." *Id.* at 91 ¶ 170.  As the individual defendants argue, however, an action under § 1983 is only available against state actors.  *See Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) ("[A] challenged activity may be state action when it results from the State's exercise of coercive power, when the State provides significant encouragement, either overt or cover, or when a private actor operates as a willful participant in joint activity with the State or its agents) (internal quotation marks and citations omitted).  Where defendants are federal officials, rather than acting under the authority of a state government or the significant encouragement of a state government, they are not acting under the color of state law.  *See Williams v. United States*, 396 F.3d 412, 414 (D.C. Cir. 2005) (dismissing the plaintiff's § 1983 claim against an officer for the U.S. Government Printing Office when that officer arrested someone for violation of a D.C. statute but "was a federal official," "the federal government gave him the power to make arrests," and "D.C. officials neither provide[d] significant encouragement nor otherwise participated" in the plaintiff's arrest) (internal quotation marks and citations omitted).

All of the defendants in this action were acting as federal officials, and the plaintiff pleads no facts that would give rise to a plausible inference that any of their actions were based on "significant encouragement" of a state government. This is especially so because, as plaintiff acknowledges, the crimes being investigated are violations of federal statutes. *See* FAC ¶ 72 (noting that the plaintiff was being investigated for possible prosecution under 18 U.S.C. §§ 1001, 1018).

Nonetheless, the plaintiff argues that the defendants are, in fact, "state actors for the purposes of § 1983" because he was "threatened with prosecution by Smith, Machen and Cohen under both the federal law and the local law within the District of Columbia." Pl.'s Opp'n Indiv. Defs.' MTD at 25. The plaintiff reasons that the DC-USAO is "unique" because it "serves as both the local and the federal prosecutor for the nation's capital." *Id.* at 26 (emphasis and quotation marks omitted). As the D.C. Circuit made clear in *Williams v. United States*, however, federal officials are not state actors even when they seek to enforce a District of Columbia statute. 396 F.3d at 414. Further, § 1983 claims brought in this Circuit are not available against federal prosecutors in the DC-USAO, even when those prosecutors are prosecuting crimes in D.C. Superior Court. *See, e.g.*, *Eastridge v. United States*, No. 06-cv-448 (CKK), 2007 WL 495797, at *11 n.8 (D.D.C. Feb. 12, 2007) ("Assistant United States Attorneys for the District of Columbia are federal officials who act under color of federal law."); *id.* (noting in the District of Columbia, other than minor prosecutions where the "maximum punishment is a fine only, or imprisonment not exceeding one year," all "other prosecutions . . . are conducted *in the name of the United States* by the United States attorney for the District of Columbia" (quoting 28 U.S.C. § 547 (emphasis in original)); *see also Cmty. for Creative Non-Violence v. Unknown Agents of the U.S. Marshals Serv.*, 791 F. Supp. 1, 2 n.1 (D.D.C.1992) (holding that United States Marshals

executing arrest warrant issued by the D.C. Superior Court were acting under color of federal

law).  For these reasons, the plaintiff's § 1983 claim is dismissed.

*        *        *

In sum, all the claims asserted against the individual defendants in Counts XI through

XVI and XXI are dismissed for failure to state a claim.

## IV.    CONCLUSION

For the foregoing reasons, the individual defendants' motion to dismiss is GRANTED,

and the agency defendants' motion is GRANTED in part and DENIED in part.  Specifically, the

agency defendants' motion to dismiss Count I is denied to the extent the plaintiff claims age

discrimination in connection with his constructive demotion, but is granted as to the remaining

allegations regarding his termination in Count I and his remaining claims.  Accordingly, Counts

II through XXI of the plaintiff's First Amended Complaint are DISMISSED.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: February 21, 2017

_____
BERYL A. HOWELL
Chief Judge