# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARK WILLIAM TOWNSEND,

     Plaintiff,

     v.

UNITED STATES OF AMERICA, *et al.*,

     Defendants.

Civil Action No. 15-1644 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

This four-year-old age-discrimination case concerns a job reassignment that lasted four days and did not take full effect until just hours before the plaintiff, Mark William Townsend, was escorted from the building and ultimately terminated due to his role in a multi-year time-and-attendance fraud against his former employer, the United States Environmental Protection Agency ("EPA"). The plaintiff initiated this action against the EPA, the United States Department of Justice ("DOJ"), and the United States of America (collectively, the "agency defendants"), and ten current and former employees of the EPA and DOJ (collectively, the "individual defendants"). After twenty of the twenty-one counts in a 174-paragraph complaint against the agency defendants were dismissed for failure to state a claim on which relief could be granted, *see Townsend v. United States* ("*Townsend I*"), 236 F. Supp. 3d 280, 326 (D.D.C. 2017), the plaintiff was granted partial leave to amend his complaint, *see Townsend v. United States* ("*Townsend II*"), 282 F. Supp. 3d 118, 133 (D.D.C. 2017), leaving, after the opportunity of more than one year of discovery, two claims at issue. In Count I of his Second Amended Complaint ("SAC"), ECF No. 66, the plaintiff alleges that he was constructively demoted due to disparate treatment age discrimination and, in Count II, he alleges a "pattern or practice" of age-based disparate treatment, both in violation of the federal Age Discrimination in Employment Act

("ADEA"), 29 U.S.C. §§ 621 *et seq.* *See* SAC ¶¶ 48–75.

Count I is predicated on the plaintiff's allegation that his "putative supervisor," Dr. Tala Henry, "illegally pressured the plaintiff [to accept a new position] by telling him to 'step aside' . . . in order to make room for 'younger' employees." *Townsend I*, 236 F. Supp. 3d at 300 (some internal quotation marks and citations omitted).[1]  Count II is predicated on allegations naming three individuals whom the plaintiff alleges were subject to age discrimination as part of the same reorganization leading to the plaintiff's reassignment.  *See Townsend II*, 282 F. Supp. 3d at 128.  Although the plaintiff's evidence on this claim was deemed "thin," *id.*, his "new allegations about older employees [were] sufficient to nudge [his] claim into the realm of the plausible by alleging 'something more than an isolated, sporadic incident,'" *id.* (quoting *Int'l Bhd. of Teamsters v. United States* ("*Teamsters*"), 431 U.S. 324, 336 n.16 (1977)).

The defendants now seek summary judgment, under Federal Rule of Civil Procedure 56(a), *see* Defs.' Mot. Summ. J. ("Defs.' MSJ"), ECF No. 73, contending that, as to Count I, the plaintiff neither suffered an adverse employment action nor can show that age was a factor in his reassignment, and as to Count II, the plaintiff has not demonstrated that age discrimination was

---

[1]     Count I also alleged age discrimination in connection with the plaintiff's removal from federal service on October 7, 2014.  *See* First Am. Compl. ("FAC") ¶¶ 93–99, ECF No. 35; *Townsend I*, 236 F. Supp. 3d at 300–02, 304–06.  The plaintiff, however, had played a significant role in a fraud scheme in which EPA employees fraudulently reported hours as worked when they were not working, and as a result, he had already, even before the reorganization began, been the subject of multiple investigations beginning on July 3, 2012, which investigations he does "not dispute . . . were, at least facially, triggered by legitimate concerns," *Townsend I*, 236 F. Supp. 3d at 291–94, 304–06.  Accordingly, all claims related to the plaintiff's termination were dismissed because, in light of his fraudulent activity and the "exhaustive[]" investigations into that activity, "an inference that age played a role in his termination. . . is rendered implausible by the totality of his allegations." *Id.* at 305.  First, the plaintiff had not established a plausible causal relationship between Dr. Henry's statement that he "step aside" and his termination, *id.*, and second, "the factual allegations, considered collectively, make abundantly clear that the EPA's proffered reason for the plaintiff's termination was his supervisory role in time-and-attendance fraud," in which the plaintiff admitted he participated, *id.*  Although the D.C. Circuit "has never held that the existence of an independent investigation is dispositive on the question of pretext," *Cruz v. McAleenan*, No. 17-5113, 2019 WL 3418453, at *4 (D.C. Cir. July 30, 2019), the plaintiff here never established a "plausible causal relationship" between his supervisor's alleged bias and his termination, *Townsend I*, 236 F. Supp. 3d at 304, in contrast to the plausible allegations related to his reassignment, *see id.* at 300–06.  Only the portion of Count I related to constructive demotion survived the motion to dismiss.  The plaintiff, in seeking to amend his complaint, "add[ed] no additional factual allegations to Count I." *Townsend II*, 282 F. Supp. 3d at 127 n.4.

EPA's "standard operating procedure," *id.*, Ex. 1, Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 2, ECF No. 73-1.[2]  For the reasons explained below, the defendants' motion is granted.

## I.    BACKGROUND

The plaintiff is a Caucasian male who began working at the EPA in 1980 and was over the age of 40 when the internal EPA reorganization prompting this suit transpired.  Defs.' MSJ, Ex. 2, Defs.' Statement of Material Facts ("Defs.' SMF") ¶ 1, ECF No. 73-2; *id.*, Ex. 7, Dep. of Mark Townsend ("Pl.'s Dep.") at 44, ECF No. 73-7.[3]  During his time at the EPA, the plaintiff "shuffled" among divisions as the agency periodically reorganized and consequently he worked in various positions with responsibility for a number of office-wide duties.  Pl.'s Dep. at 10–38, ECF No. 73-7 (plaintiff agreeing "[i]t was not unusual to see reorganizations across EPA" and expressing the view that "all [reorganizations] are is a shuffling, all they are is a political game, the shuffling.  The staff, once again, do[es] exact[ly] the same work, their assignments do not change. . . . [t]he roles and responsibilities for the people on the teams don't change"); *see also* Defs.' Mem. at 1 ("As with many federal agencies over the years, EPA's internal structure has changed several times through reorganization of its offices.").[4]  From December 2005 until the alleged adverse employment action on July 27, 2014, the plaintiff served as Supervisory

---

[2]     All counts against the individual defendants have previously been dismissed and thus only the agency defendants remain parties to this action.  *See Townsend I*, 236 F. Supp. 3d at 320–26 (dismissing all claims asserted against individual defendants for failure to state a claim).

[3]     The plaintiff was 68 years old on October 7, 2015, when this suit was filed.  *See* Compl. ¶ 12, ECF No. 1.  Both the plaintiff's first and second amended complaints filed in subsequent years continue to state his age as 68 years old.  *See* FAC ¶ 5, (filed Feb. 11, 2016) (also stating plaintiff was "67 at the time of the . . . government violations"); SAC ¶ 4 (filed Nov. 13, 2017).  Neither party clarified the plaintiff's age as of August 2019, but the plaintiff mentioned, in passing, in his deposition taken on June 21, 2018, that he was 71 years old.  Pl.'s Dep. at 44, ECF No. 73-7.  Thus, the plaintiff is presumably about 72 years old now.

[4]     The parties have submitted as exhibits different excerpts from the same June 21, 2018 deposition of the plaintiff.  For ease of review, citations to this deposition identify the docket number and pagination assigned by the Court's Case Management-Electronic Case File ("CM-ECF") system.

Biologist (Branch Chief), a GS-15 position, in the High Production Volume Chemicals Branch ("HPVCB") of the Risk Assessment Division ("RAD") of the EPA's Office of Pollution Prevention and Toxics. Defs.' SMF ¶¶ 2, 4; Pl.'s Dep. at 20, ECF No. 73-7. The plaintiff describes this position as "mid-level management." Pl.'s Dep. at 20, ECF NO. 73-7.

A. **Reorganization Begins in 2013 and Eventually Dissolves Plaintiff's Branch**

Starting in 2013, the EPA's Office of Pollution Prevention and Toxics ("OPPT"), of which the plaintiff's Branch and Division were a part, began the process of reorganizing. Defs.' SMF ¶ 4; Defs.' MSJ, Ex. 3, Decl. of Tala Henry ("Henry Decl.") ¶¶ 4–13, ECF No. 73-3. During March and April 2013—while the plaintiff was already under investigation for time-and-attendance fraud, *see Townsend I*, 236 F. Supp. 3d at 291–93—he discussed with his supervisor, Dr. Jeffery Morris, then the acting Director of the RAD, the plaintiff's vision for the reorganization. Defs.' SMF ¶ 3; Defs.' Mem. at 3; Defs.' MSJ, Ex. 5, Decl. of Jeffery T. Morris ("Morris Decl.") ¶¶ 2–4, ECF No. 73-5. In a March 27, 2013 meeting, Dr. Morris claims that the plaintiff proposed that his branch, the HPVCB, "be dissolved and subsumed into other RAD branches," and that the plaintiff "be reassigned from Branch Chief to a RAD immediate office position." Morris Decl. ¶ 4. Later that same day, Dr. Morris received a follow-up email from the plaintiff, which Dr. Morris says "reiterated [plaintiff's] proposal." *Id.* (citing Ex. A to Morris Decl., Email from Plaintiff to Jeffery Morris, dated March 27, 2013 ("Mar. 2013 Email") at 1, ECF No. 73-6)). The plaintiff's email opens by referring to "our early morning conversation" and indicates that the purpose of the email is "to clarify and probably commit myself." Mar. 2013 Email. The plaintiff suggests that RAD be reorganized into three branches, with "[o]ne focused on PMNs," and "two focused on generic support for toxic chemical review," *id.*; Morris Decl. ¶ 4 (noting that "'PMNs' stands for pre-manufacture notices and relates to the EPA's

4

responsibility to review chemicals before they are manufactured and enter commerce in the United States"), and the email contains the plaintiff's recommendations as to both the positions needed and employees to fill various roles, Mar. 2013 Email. The closing sentence states, regarding the plaintiff's own role: "Deputy BC [for Branch Chief]—nope. Deputy DD [for Division Director] and sadly, I have suites [sic] and shirts and dress shoes and even scads of ties. I can be pretty when necessary." *Id.*[5] In other words, the plaintiff's "nope" indicates his rejection of maintaining his then-position as a Branch Chief and preference, though "sadly," for a more senior position as Deputy Division Director.

A few weeks later, on April 11, 2013, the plaintiff again wrote Dr. Morris about "perceiv[ing] a significant proposal towards changing [plaintiff's] role and responsibilities" and requesting "a written proposal regarding when (date) [his] current responsibilities will cease and new role will begin." Ex. B to Morris Decl., Email from Plaintiff to Jeffery Morris, dated April 11, 2013 ("Apr. 2013 Email") at 5, ECF No. 73-6. The plaintiff goes on to acknowledge that he is to become a "Special Assistant in the Immediate Office of the Risk Assessment Division," a position that "does not currently exist." *Id.*

Dr. Morris understood the plaintiff's recommendation as proposing that his branch, HPVCB, "be dissolved and subsumed into other RAD branches," and that the plaintiff "be reassigned from Branch Chief to a RAD immediate office position." Morris Decl. ¶ 4. Since this was the reassignment that the plaintiff now challenges, the defendants contend this "fact [] casts doubt on his subsequent contention that the reassignment was somehow discriminatory and adverse." Defs. Mem. at 11. The plaintiff disputes that, in his communications with Dr. Morris,

---

[5]     The plaintiff disparages the Deputy Division Director role as compared to Branch Chief in his deposition, stating "branch chiefs think of deputy division director as busy worker [gopher] job. A special assistant is beneath that. To work for a deputy division director who's a [gopher], doing whatever the division director doesn't want to do, to be the person that works under that person sucks." Pl.'s Dep. at 37, ECF No. 73-7.

he proposed to eliminate his own Branch or asked to be reassigned to the RAD Immediate Office. Pl.'s Opp'n Defs.' Mot. Summ. J. ("Pl.'s Opp'n") at 7–9, ¶¶ 2, 4–7, 9, 14, ECF No. 74-1; *id.*, Ex. 4, Dep. of Mark Townsend ("Pl.'s Dep.") at 3–4, 6–15, ECF No. 74-4.[6] When confronted with his March 2013 email to Dr. Morris, the plaintiff back-tracked, claiming that he "clarified in later emails" what he meant, and that the March 2013 email was an "off-the-cuff response that [he] disagreed with [Dr. Morris]" and that he "was trying to be polite." Pl.'s Dep. at 9, ECF No. 74-4. He concedes, however, that the email never said whether he "agreed . . . or disagreed with [Dr. Morris]" but rather "asked lots of questions about what was going through his mind and gave him information about [himself] and the organization." *Id.* at 10. He also stated that he "disagreed [with Dr. Morris] in person in public" and "did not think [he] needed to repeat that in writing." *Id.* at 11.[7]

When the reorganization ultimately took shape, the number of OPPT Divisions was reduced from seven to six. Defs.' SMF ¶ 5; Henry Decl. ¶ 4. OPPT's RAD remained, but all four branches within it, including the plaintiff's, were dissolved and reincorporated, along with

---

[6]  The plaintiff, who is represented by counsel, failed to submit a "separate concise statement" of disputed material facts to accompany his opposition to the defendants' motion as required by this Court's local rules. *See* LCvR 7(h)(1). "In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." *Id.* Instead of complying with this rule, the plaintiff's opposition memorandum includes a section titled "DISPUTED MATERIAL FACTS," Pl.'s Opp'n at 7–11, consisting of twenty-three paragraphs that do not precisely correspond to the paragraphs in the defendants' statement of undisputed material facts. *Compare* Defs.' SMF (containing 17 paragraphs) *with* Pl.'s Opp'n at 7–11 (containing 23 paragraphs). The plaintiff's failure to identify precisely which facts are disputed, with record citations, has complicated the Court's task on review, but nevertheless, where possible and clear, the plaintiff's disputed facts are recognized. *See Burke v. Gould*, 286 F.3d 513, 518–19 (D.C. Cir. 2002) (leaving it to the district court to decide whether to assume facts identified by the moving party are admitted, and noting that the local rules must be "construed in harmony" with Federal Rule of Civil Procedure 56(c), which directs the Court to consider the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in determining whether there is a genuine issue as to any material fact) (internal citation omitted) (quoting an earlier version of FED. R. CIV. P. 56(c)); *accord Arrington v. United States*, 473 F.3d 329, 335 (D.C. Cir. 2006) (the local rule "permits, but does not require" the Court to treat the material facts identified by the moving party as admitted).

[7]  Citing this back-tracking by the plaintiff as an example, the defendants suggest that the record "significantly undermines [plaintiff's] credibility." Defs.' Reply in Supp. MSJ ("Defs.' Reply") at 7 n.2, ECF No. 77. As discussed below, *infra* Section III.A.2, any focus on the plaintiff's credibility is misplaced at the summary judgment stage.

staff from two branches of a division that had been eliminated, into five new, multidisciplinary branches, affecting a total of 80 positions. Defs.' SMF ¶¶ 5–6; Henry Decl. ¶¶ 4–5, 13; Defs.' Mem. at 3–4 (characterizing this reorganization as "major"). As a result of the reorganization, the number of leadership positions within OPPT was reduced from 17 to 13. Defs.' SMF ¶ 8; Defs.' Mem. at 4; Henry Decl. ¶ 5; Ex. 2 to Henry Decl., Memorandum Explaining Reorganization ("Reorganization Mem."), dated Sept. 11, 2013 at 5, 6, 36, ECF No. 73-4 (explaining that "consolidating the [risk-assessment] functions in a single division will significantly improve integration, consistency, coordination, collaboration, decision-making and timeliness among disciplines"). The defendants claim that because the "HPVC Branch in RAD was eliminated," the plaintiff's previous role of HPVC Branch Chief "ceased to exist." Defs.' SMF ¶ 7. The plaintiff maintains, however, that despite this reorganization, the position he previously held "still existed" and "was not eliminated—other than by name." Pl.'s Dep. at 17, ECF No. 74-4 ("If the branches were one, two, three, four, and five, and I was a branch chief, and nothing was advertised, I would say my position still existed."); Pl.'s Opp'n at 8 ¶ 10.

### B. Plaintiff's Supervisor Allegedly Encourages Him and Others to "Step Aside" for Younger Employees as Part of Reorganization

As part of the reorganization, "Dr. Tala Henry became the Director of RAD" and thus the plaintiff's putative supervisor, in which role she "was tasked with developing RAD's reorganization staffing plan," was "significantly, but not solely, involved in drafting the mission statement and staffing plan" for the RAD, and met with each manager who would be affected, including the plaintiff. *See* Defs.' Mem. at 4; Henry Decl. ¶¶ 1, 4, 6, 8.[8] Dr. Henry consulted

---

[8]     Dr. Henry acted as, but was not, the formal director of the RAD during this period. Wendy Cleland-Hamnett, who at the time was the Director of the OPPT, *see* SAC ¶ 17, explained that she had delegated some authority to Dr. Henry, who was to take command of the reorganized RAD, to shape it, Pl.'s Opp'n, Ex. 5, Dep. of Wendy Cleland-Hamnett ("Cleland-Hamnett Dep.") at 2–4, ECF No. 74-5; Pl.'s Opp'n at 8 ¶ 8.

with Dr. Morris, the acting RAD Director, "to gain insights on the current manager's roles, responsibilities, management styles and functioning/performance in their management roles," Henry Decl. ¶ 7; Morris Decl. ¶ 5, and "convened several meetings with existing managers," including the plaintiff, "to discuss options for organizational units within the division," Henry Decl. ¶ 8.

On August 8, 2013, Dr. Henry sent an email to the plaintiff and six other employees explaining that six "management (i.e. supervisory)" positions and one "Sr. Science Advisor (non-supervisory)" position would be available following the reorganization and asking the employees to provide their top three preferences among those positions. Ex. 1 to Henry Decl., Email from Tala Henry to Plaintiff and Others, dated Aug. 8, 2013 ("August 2013 Email from Henry") at 2, ECF No. 73-4; Henry Decl. ¶ 8. Dr. Henry describes both the management and senior advisor positions as "senior level" roles in the newly constituted RAD, Henry Decl. ¶ 8, but does not dispute that her August 2013 email characterized the "Sr. Science Advisor" position as "non-supervisory," August 2013 Email from Henry at 2.

On September 6, 2013, Dr. Henry met with the plaintiff and informed him that "the proposed reorganization plan would eliminate the HPVC Branch and that his position would no longer exist." Defs.' Mem. at 5; Henry Decl. ¶ 10. Dr. Henry also told the plaintiff that he would eventually be reassigned from Supervisory Biologist (Branch Chief, GS-15, Step 10) in the HPVCB to Senior Advisor (Biologist, GS-15, Step 10) in the RAD Immediate Office. Defs.' SMF ¶¶ 9, 10; Henry Decl. ¶ 10; Pl.'s Dep. at 36, ECF No. 73-7.[9] Most significantly for his age

---

[9] The plaintiff denies that Dr. Henry ever used the word "reassignment," Pl.'s Dep. at 27, ECF No. 74-4, and suggests, without further explanation, that Dr. Henry failing to use this word "allow[s] for an inference that older employees treated in an ageist fashion were pretextually labeled by EPA upper management," Pl.'s Opp'n at 10 ¶ 22. To the extent the plaintiff is trying to generate a disputed fact, whether Dr. Henry actually used the word "reassignment" at this meeting is not material since the parties agree that the plaintiff was reassigned.

discrimination claim, the plaintiff alleges that, at this meeting, Dr. Henry asked him to "do [her] a favor," to "step aside" and "move up to the front office, [to] give up [his] branch chief role for the younger staff that just went through training at American University." Pl.'s Dep. at 5–6, 19–20, ECF No. 74-4; Pl.'s Opp'n at 7–8 ¶ 3.

Dr. Henry categorically denies having made such a request and asserts that age played no role in her decision to reassign the plaintiff. Henry Decl. ¶ 12 ("Plaintiff's age was never a factor in my decision to reassign him. Nor did I ever make any statements that Plaintiff would be reassigned from Branch Chief to a Senior Advisor position in order to make positions available to younger staff."). She contends that the plaintiff was "uniquely qualified—from both educational and experience perspective[s]" for the Division-wide role to which he was reassigned, *id.* ¶ 10, based on his experience with several Division-level responsibilities such as budget formulation assistance, contracts, and information technology, *id.* ¶ 11, and that, because the reorganized RAD would have 80 rather than 50 full-time equivalent employees, the need for the types of activities the plaintiff would be assigned would be increasing, *id.*; *see also* Pl.'s Dep. at 20–34, ECF No. 73-7 (the plaintiff describing his experience in information technology, budgeting, contracting, and negotiating); Defs.' SMF ¶ 13 (referring to these excerpts); Defs.' Mem. at 15 (describing plaintiff's reassignment to "front office" with "Division-level responsibilities that Plaintiff . . . had already been performing as a Branch Chief, and . . . he was the best qualified employee within RAD to perform them at the Division-level"). The plaintiff concedes that no witnesses were present at this meeting in which Dr. Henry asked him to "step aside" "for the younger staff," Pl.'s Dep. at 39, ECF No. 73-7, that he did not record it, *id.* at 39–

40, and that he did not take contemporaneous notes while speaking with Dr. Henry, *id.* at 40; Defs.' SMF ¶ 12.

The plaintiff claims that he later heard about a similar conversation Dr. Henry allegedly had with Dr. Jennifer Seed, another employee who was reassigned during the reorganization. Pl.'s Dep. at 39, ECF No. 73-7; Pl.'s Opp'n at 9 ¶ 12; *id.*, Ex. 2, Decl. of Dr. Jennifer Seed ("Seed Decl.") ¶¶ 3–5, 7, ECF No. 74-2. Seed, while represented by the same counsel as the plaintiff here, has also sued the EPA for alleged age discrimination in another case pending before another Judge of this Court. *See Seed v. EPA*, No. 16-cv-748 (TSC). In a declaration filed in this instant litigation, Seed reiterates her claims from her own case that Dr. Henry "discouraged [her] from applying for certain branch chief positions because EPA was hoping to fill those positions with younger people who had just been through the leadership training program." Seed Decl. ¶ 3 (internal quotation marks and alterations omitted). Dr. Seed asserts, based on her own experience and conversations with the plaintiff, that "it appears that EPA was openly engaging in age discrimination as a matter of policy," *id.* ¶ 5, and that the similarity of the statements made to her and the plaintiff "show that age was a factor in EPA policy decisions," *id.* ¶ 7; *see also* Pl.'s Opp'n, Ex. 3, Dep. of Jennifer Seed ("Seed Dep.") at 2–3, ECF No. 74-3 (Dr. Seed alleging that Dr. Henry told her "[w]e were hoping to fill those [branch chief positions] with younger people who had just been through the leadership training program"). Despite alleging a pattern of discrimination against himself, Dr. Seed, and two other EPA employees, Dr. Kay Austin and Dr. Phillip Sayre, *see* SAC ¶¶ 59–75, the plaintiff concedes that no documentation or witnesses corroborate his belief that age was a factor in reassigning any employee other than himself and Dr. Seed. Pl.'s Dep. at 43–46, ECF No. 73-7; Defs.' SMF ¶¶ 15, 16; *but see* Pl.'s Opp'n at 10–11 ¶ 23 (contending that "[b]ased upon the questions asked *by*

*the government* during the deposition," plaintiff "has 'no doubt at all' that he, Dr. Jennifer Seed, Dr. Phillip Sayre and Dr. Kay Austin were discriminated against based on their age(s)." (emphasis in original) (quoting Pl.'s Dep. at 29, ECF No. 74-4)).[10]

### C. Plaintiff is Reassigned for Four Days Before Being Placed on Paid Leave and Ultimately Terminated

The plaintiff's reassignment from Supervisory Biologist (Branch Chief) of the High Production Volume Chemicals Branch of the RAD to Senior Advisor (Biologist) of the RAD became effective on July 27, 2014. Defs.' SMF ¶ 10; Henry Decl. ¶¶ 3, 13; Ex. 3 to Henry Decl., Email from Bobby Moore, dated July 15, 2014 at 38, ECF No. 73-4 (noting that "[t]his is the [second] phase of the reorganization process and the effective dates . . . provided do[] not make this reorganization final"); Ex. 4 to Henry Decl., Notification of Personnel Action, dated July 27, 2014 ("Notification of Personnel Action") at 40, ECF No. 73-4 (reassigning plaintiff from "Supervisory Biologist" in the HPVCB of the RAD to "Biologist" in the RAD). According to the plaintiff, however, he was not made aware that his reassignment had been completed until the day he was removed from the building on July 31, 2014. Pl.'s Dep. at 50, ECF No. 73-7; Defs.' Reply at 9 n.3. Indeed, he asserts that "Dr. Tala Henry had obviously not decided what [the plaintiff] was going to do [or] when [he] was going to do it" and that "[n]o one ever" "[came] in and [said], 'Mark, you are no longer a branch chief. I am taking off your stripes and

---

[10] Dr. Seed asserts that both Drs. Sayer and Austin and another EPA employee, Dr. Oscar Hernandez, were "to the best of [her] belief, discriminated against based upon their age." Seed Decl. ¶ 6; *see also* Seed Dep. at 3–4 (listing these individuals). Dr. Hernandez was discussed at an earlier stage of this litigation, in connection with the plaintiff's claim of race discrimination, because Hernandez, whom the plaintiff described as Hispanic, "was removed from his job . . . with knowledge that he engaged in significant misconduct for 20 years, yet Hernandez was neither admonished nor was his record in the least reflective of his disastrous performance and decades-long criminal misconduct." *Townsend I*, 236 F. Supp. 3d at 291–92 (quoting FAC ¶ 50). The plaintiff also speculated that Hernandez "'would have' been subjected to 'pretextual discrimination' . . . if he only fit the 'older' profile of Plaintiff." *Id.* at 310 (quoting FAC ¶ 55). Hernandez was rejected as a comparator for the plaintiff because he "retired prior to any investigation by EPA officials into time-and-attendance fraud at the EPA." *Id.* (quoting FAC ¶ 46).

you're now something else.'" Pl.'s Dep. at 53, ECF No. 73-7. In fact, when asked in his deposition whether he "ever serve[d] as a senior advisor at the EPA at the RAD Immediate Office," the plaintiff replied, "No. No." *Id.* at 37; *but see id.* at 36 ("I *became a biologist for one day* before I was no longer with the reorganization [sic]." (emphasis added)).

At any rate, the plaintiff's reassignment did not change his job series or pay grade, nor did it reduce his pay, benefits, or working hours. Defs.' SMF ¶ 11; Pl.'s Dep. at 51–55, ECF No. 73-7; Notification of Personnel Action at 40.[11] Although his "staff were being picked up by other people periodically to do things," he "was still being held accountable to get certain projects done." Pl.'s Dep. at 57, ECF No. 73-7. Consequently, the plaintiff testified that he was "still a branch chief" and "was still managing brominated flame retardants, . . . still managing other projects, . . . [and] still being asked by Tala Henry to attend management meetings" until the day of his removal, and that he "lost no projects . . . and actually picked up extra projects." Pl.'s Dep. at 36–37, 51–53, 57, ECF No. 73-7; Defs.' SMF ¶ 14.[12] Thus, the plaintiff states that "after the reorganization, [he] was still floating—[he] *was still a branch chief doing [his] work . .*

---

[11]  Apparently, technically, the plaintiff's pay grade changed from GM-15 to GS-15. *See* Notification of Personnel Action at 40. The plaintiff characterizes his prior status as a GM, rather than GS, employee as being "left over from a game [federal employers] played for a while where they actually had half steps." Pl.'s Dep. at 34, ECF No. 73-7. In other words, the plaintiff does not allege that the difference between GM and GS had any effect on his salary, and in fact admits that his salary did not change following his reassignment. *Id.* Indeed, the plaintiff's only response to the fact that "his grade and benefits were not 'diminished'" on his reassignment, which undercuts his claim of an adverse employment action, is to speculate that "someone at EPA has incorrectly signed a series of time and attendance records allowing GS-15 pay and benefits to an employee assigned the duties of an employee of lesser grade." Pl.'s Opp'n at 7. Nothing in the record suggests, however, that a GS-15 is a "lesser grade" than a GM-15.

[12]  The plaintiff at one point contends that his supervisory duties and assignments were reduced "six to eight weeks" before the reorganization. Pl.'s Opp'n at 7 ¶ 1. Yet the portions of the deposition cited as support for this claim are not included in any submitted excerpts, *id.* (citing deposition pages only partially reproduced at Pl.'s Dep. at 2, ECF No. 74-4), making any evaluation of how to square this claim with the plaintiff's statements elsewhere that he "lost no projects . . . and actually picked up extra projects," Pl.'s Dep. at 57, ECF No. 73-7, difficult.

. until [it] was the last day at EPA, and then [he got notice] saying [he] was a biologist and then [he] was walked out the door." Pl.'s Dep. at 36, ECF No. 73-7 (emphasis added)

At the same time, for the four days he was present after the reorganization, the plaintiff states in his opposition brief that he was "stripped of all supervisory [and] managerial responsibilities." Pl.'s Opp'n at 10 ¶ 20. While his "pay stayed the same," the plaintiff complains that his "responsibilities were significantly less," Pl.'s Dep. at 51, ECF No. 73-7, because he was no longer responsible for "checking staff's work, telling staff what to do, solving staff problems, [or] working with other branch chiefs," *id.* at 52, but instead was apparently asked to scan documents, Pl.'s Dep. at 18, ECF No. 74-4, a task which he suggests would ordinarily be assigned to library staff at the GS-11, GS-12, or GS-13 level, *id.* at 28; Pl.'s Opp'n at 8–10 ¶¶ 11, 20, 21, and which he describes as "bullshit tasks," Pl.'s Dep. at 18, ECF No. 74-4, "busy work," *id.* at 26, "make believe," *id.*, "make work," *id.*, "not real," *id.*, and "below-grade-level," *id.* at 28. The plaintiff's starkly differing characterizations of his tasks in his reassigned position for the four days between July 27 and 31, 2014, are difficult to reconcile, except perhaps to include scanning as among the new assignments he was given.[13]

On July 31, 2014, four days after the reorganization was put into effect, the plaintiff was removed from the building and placed on paid administration leave in connection with his role in time-and-attendance fraud at the EPA. *See* Defs.' Mem. at 2 n.1; Defs.' Reply at 9 n.3; *Townsend I*, 236 F. Supp. 3d at 295; SAC ¶ 43. The plaintiff was formally terminated from the

---

[13]     The plaintiff was also moved to a different office space, which he found to be inferior to his previous office. Pl.'s Dep. at 52, 57, ECF No. 73-7 ("I was . . . being harassed by moving me into a smaller office before the reorganization was final, an office shared with a GS-13. I was being moved out of my office where I used to meet with my staff.").

EPA on October 7, 2014 for his role in this fraudulent activity.  Defs.' SMF ¶ 17; *Townsend I*,

236 F. Supp. 3d at 291–95.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "A genuine issue of material fact

exists 'if the evidence, viewed in a light most favorable to the nonmoving party, could support a

reasonable jury's verdict for the nonmoving party.'" *Figueroa v. Pompeo*, 923 F.3d 1078, 1085

(D.C. Cir. 2019) (internal quotation marks omitted) (quoting *Hairston v. Vance-Cooks*, 773 F.3d

266, 271 (D.C. Cir. 2014)).  The moving party bears the burden to demonstrate the "absence of a

genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986),

while the nonmoving party must present specific facts, supported by materials in the record, that

would be admissible at trial and that could enable a reasonable jury to find in its favor, *see*

*Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*,

795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is

"whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving

party'") (quoting *Liberty Lobby*, 477 U.S. at 248); *see also Greer v. Paulson*, 505 F.3d 1306,

1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (internal

quotation marks and citation omitted)); FED. R. CIV. P. 56(c), (e)(2)–(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to

the jury is as much art as science."  *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123

(D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve

genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572

U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (internal quotation marks omitted) (alteration in original) (quoting *Liberty Lobby*, 477 U.S. at 255).  Courts "may not make credibility determinations or weigh the evidence," *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019) (internal quotation marks and citations omitted), since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (internal quotation marks and citation omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

The fact that a plaintiff's testimony is uncorroborated is immaterial for purposes of summary judgment, since "[c]orroboration goes to credibility, a question for the jury, not the district court." *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016).  Nonetheless, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (internal quotation marks omitted); *accord* FED. R. CIV. P. 56(e).  If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is only required to consider the materials

explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

## III.    DISCUSSION

As noted, only two of the plaintiff's twenty-one original claims remain: his alleged constructive demotion due to age discrimination claim (Count I), and his pattern or practice disparate treatment claim (Count II).  For the reasons that follow, the defendants are entitled to summary judgment on both Counts.

### A.    Count I: Alleged Constructive Demotion Due to Age Discrimination

In Count I, the plaintiff alleges that his four-day reassignment, during which his responsibilities largely remained the same as when he was Branch Chief, except for the addition of new assignments, constituted a constructive demotion and that Dr. Henry's statements, as his supervisor, that he should "step aside" to make room for younger employees is direct evidence that age was a factor in his reassignment, in violation of the ADEA.  *See* SAC ¶¶ 48–58; Pl's Opp'n at 3–4, 13; Pl.'s Dep. at 19, ECF No. 74-4.  Even crediting as true, as required on summary judgment, this direct evidence that age was a factor in his reassignment, the plaintiff has failed to show that his reassignment constituted an adverse employment action and thus summary judgment to the defendants on Count I is warranted.

#### 1.    *Legal Standard*

The Supreme Court has instructed that "the precise requirements of a prima facie [employment discrimination] case can vary depending on the context."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  In view of this "emphasis on flexibility," the D.C. Circuit has adopted, for claims asserted under various anti-discrimination statutes, a "general version of the prima facie case requirement: 'the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to

an inference of discrimination.'" *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir.

2006) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)); *see also Czekalski v.*

*Peters* ("*Czekalski I*"), 475 F.3d 360, 364 (D.C. Cir. 2007); *George v. Leavitt,* 407 F.3d 405, 412

(D.C. Cir. 2005); *Krodel v. Young*, 748 F.2d 701, 705 (D.C. Cir. 1984).

When a defendant moves for summary judgment on an age discrimination claim, "the

'operative question' is whether 'the employee produced sufficient evidence for a reasonable jury

to find that . . . the employer intentionally discriminated against the employee on the basis of'

age. . . . If 'the plaintiff offers direct evidence of discriminatory intent, that evidence will

generally entitle a plaintiff to a . . . trial.'" *Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014)

(internal citations and quotation marks omitted) (ellipses in original) (quoting *Ayissi-Etoh v.*

*Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam)). Such evidence gives clear rise

"to an inference of discrimination" sufficient to establish a *prima facie* case. One form of direct

evidence is "a statement that itself shows [unlawful] bias in the [employment] decision." *Vatel*

*v. Alliance of Auto Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (Kavanaugh, J.); *see also Ayissi-*

*Etoh*, 712 F.3d at 576–77 (holding that an alleged reference to the plaintiff as a "young black

man" was direct evidence that entitled the plaintiff to a jury trial, and that "when the issue comes

down to a credibility contest . . . [the Court] cannot resolve the dispute at the summary judgment

stage against the non-moving party"); *Stone v. Landis Constr. Corp.*, 442 F. App'x 568, 569

(D.C. Cir. 2011) (per curiam) (unpublished) (reversing a district court's grant of summary

judgment for the defendant where the defendant allegedly told the plaintiff "you're old" when

expressing concern as to whether the plaintiff could perform physical labor, which "qualified as direct evidence of [the defendant's] discriminatory intent").

Absent direct evidence of discrimination, a plaintiff may prove discrimination through circumstantial evidence using the familiar three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green* ("*McDonnell Douglas*"), 411 U.S. 792, 802–05 (1973), *see, e.g.*, *id.* (applying framework to Title VII claim); *Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010) (applying framework to an ADEA claim); *Krodel,* 748 F.2d at 705 (same). Under *McDonnell Douglas*, the plaintiff has the initial burden of production to establish a *prima facie* case of discrimination; if he does, then the employer must articulate a legitimate, non-discriminatory reason for its action; and if it does, then the plaintiff must receive an opportunity to show that the employer's reason was a pretextual cover for discrimination. *McDonnell Douglas,* 411 U.S. at 802–07; *Reeves*, 530 U.S. at 142–43. "To be faithful to th[e] 'sweeping' language [of the ADEA] . . . plaintiffs may also prevail by proving that age was *a* factor in the employer's decision." *Ford*, 629 F.3d at 206.

A plaintiff in any employment discrimination case must first establish that "she [or he] is a member of a protected class." *Chappell-Johnson*, 440 F.3d at 488 (quoting *Brown*, 199 F.3d at 452). The class protected by the ADEA is "individuals who are at least 40 years of age." 29 U.S.C. § 631(a). The defendants agree that the plaintiff "is over 40 years old." Defs.' SMF ¶ 1. Accordingly, discussion will be limited to the two remaining "essential elements of [an age] discrimination claim[:] that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's . . . age." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (Kavanaugh, J.) (citing 29 U.S.C. §§ 621 *et seq.*).

### a. Evidence of Age Discrimination by Federal Employers

The ADEA sets a more exacting non-discrimination standard for federal employers than for private employers. *See Miller v. Clinton*, 687 F.3d 1332, 1336–37 (D.C. Cir. 2012). While 29 U.S.C. § 623 prohibits private employers from making employment decisions for which age discrimination is a but-for cause, Section 633a prohibits federal employers from taking age into account at all. *Ford*, 629 F.3d at 205–06. Thus, if the federal employer considers age in making an employment decision, the analysis stops there, since "any amount of discrimination tainting a personnel action, even if not substantial, means that the action was not 'free from any discrimination based on age.'" *Id.* at 206 (quoting 29 U.S.C. § 633a). While federal employees can still make the *prima facie* case through the ordinary burden-shifting analysis of *McDonnell Douglas*, they may also merely prove "that age was *a* factor in the challenged personnel action." *Id.* at 206–07 (emphasis in original). On the other hand, proving that age was a factor, along with the other elements of a successful discrimination claim, only entitles a plaintiff to "declaratory and possibly injunctive relief, it is insufficient to merit instatement and backpay. For those types of remedies, a but-for-standard of causation is necessary." *Id.* at 207.[14]

Direct evidence is not necessary to establish that age was a factor in the employment action, *see Townsend I*, 236 F. Supp. 3d at 300, but such evidence suffices as a nearly automatic ticket to a trial, *see Wilson v. Cox*, 753 F.3d at 247 ("If the plaintiff offers direct evidence of discriminatory intent, that evidence will generally entitle a plaintiff to a trial." (internal quotation marks, alteration, and citation omitted)). "Direct evidence of discrimination is evidence that, if

---

[14]     The defendants assert that the plaintiff is not entitled to the remedies he seeks, *see* SAC at 18–19 (Prayer for Relief) (seeking reinstatement, retroactive promotion, back pay, front pay, and "$300,000.00 in compensatory damages" and attorney's fees); Pl.'s Dep. at 61–62, ECF No. 73-7 (discussing plaintiff's request for "monetary compensation for emotional distress"), because he was terminated for time-and-attendance fraud and, because of that fraud, is unable to prove that age was the but-for cause in his reassignment, *see* Defs.' Mem. at 18–20 & n.3; Defs.' Reply at 9 n.3. Resolution of any dispute about the remedies available to the plaintiff is unnecessary since summary judgment is granted to the defendants.

believed by the fact finder, proves the particular fact in question *without any need of an inference.* In the context of [federal employment discrimination statutes], direct evidence includes any statement or written document showing a discriminatory motive *on its face.*" *Davis v. Ashcroft*, 355 F. Supp. 2d 330, 340 n.2 (D.D.C. 2005) (internal quotation marks and citations omitted) (emphasis in original).

Statements merely related to age do not qualify as direct evidence unless they clearly manifest discriminatory intent. *See Iyoha*, 927 F.3d at 569 ("In order to defeat a motion for summary judgment, [an employment discrimination plaintiff] must show more than 'general bias.' . . . [h]e must also produce evidence to show that the [employment action] was 'motivated by that bias.'" (quoting *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016))). In *Wilson v. Cox*, for instance, the D.C. Circuit reversed a grant of summary judgment for the defendants, finding that a statement that older employees "didn't come here to work, [they] came here to retire," as well as a derogatory statement expressing concern that older employees were falling asleep on the job, would allow a reasonable trier of fact to conclude that age was a factor in the employer's decision. 753 F.3d at 248–49; *cf. Breen v. Chao*, 253 F. Supp. 3d 244, 258 n.9 (D.D.C. 2017) (finding supervisor's statements of concern about an "aging workforce" did not constitute direct evidence because these concerns were "subject to multiple interpretations").

### b.     Adverse Employment Actions

An adverse employment action may arise from "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760 (1998). The types of actions considered to be adverse are not limited to a categorical list. *See Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006). Even "a

lateral transfer may qualify as an adverse action." *Czekalski v. LaHood* ("*Czekalski II*"), 589

F.3d 449, 456 (D.C. Cir. 2009) (emphasis omitted). "[N]ot everything that makes an employee

unhappy," however, "is an actionable adverse action." *Baird v. Gotbaum*, 662 F.3d 1246, 1250

(D.C. Cir. 2011) (internal quotation marks omitted) (quoting *Douglas v. Donovan*, 559 F.3d 549,

552 (D.C. Cir. 2009)). In deciding whether lateral transfers and other actions short of

termination or pay cuts are adverse, courts distinguish between actions causing "'purely

subjective injuries,' such as dissatisfaction with a reassignment, public humiliation, or loss of

reputation" and those causing "an employee [to] 'experience[] materially adverse consequences

affecting the terms, conditions, or privileges of employment or future employment opportunities

such that a reasonable trier of fact could find objectively tangible harm.'" *Holcomb*, 433 F.3d at

902 (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002)). Ultimately, in a

lateral transfer case, the question is whether "the reassignment left the plaintiff with significantly

diminished responsibilities." *Czekalski I*, 475 F.3d at 365.

While no categorical rule governs assessment of whether a plaintiff's new responsibilities

qualify as "significantly diminished," *see id.*, courts have considered at least the following

factors: whether the plaintiff was stripped of supervisory duties, *see id.* at 364 (quoting *Stewart v.

Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003) ("[W]ithdrawing an employee's supervisory duties

. . . constitutes an adverse employment action.")); whether central parts of the plaintiff's

workload were reduced, *see Wilson v. Clayton*, No. 16-cv-133 (CRC), 2019 WL 1879547, at *1,

*5 (D.D.C. Apr. 27, 2019) (finding that a reasonable trier of fact might conclude that a reduction

in auditing duties for an employee hired as "Assistant Inspector General for Audits," among

other factors, constituted adverse action); and whether the plaintiff's duties in the new position

were clearly inferior or required less skill, as opposed to simply representing a different type of

work altogether, *see Baloch*, 550 F.3d at 1197 (suggesting reassignment to "qualitatively inferior work requiring . . . less skill or knowledge" would constitute adverse action); *Burford v. Powell*, No. 15-cv-2074 (RMC), 2019 WL 935635, at *7 (D.D.C. Feb. 26, 2019) (finding that a law enforcement officer's "constant string of assignments to non-critical posts was of sufficient duration to make it appear that [she] had been demoted" and therefore constituted a materially adverse action in a retaliation case); *cf. Sykes v. Napolitano*, 710 F. Supp. 2d 133, 134, 143 (D.D.C. 2010) (concluding that reassignment of a Secret Service agent from heading a former first lady's security detail to heading a training academy, with similar pay and benefits, did not constitute adverse action because while the agent's "duties have definitely *changed*, it cannot be said that they are 'greatly diminished'" (emphasis in original)). An *increased* workload does not constitute a materially adverse action, *see Forkkio*, 306 F.3d at 1131; *Lester v. Natsios*, 290 F. Supp. 2d 11, 29–30 (D.D.C. 2003), nor does "loss of reputation," *Holcomb*, 433 F.3d at 902. Whether the challenged reassignment rises to the level of materially adverse "is generally a jury question." *Czekalski II*, 549 F.3d at 456 (internal quotation marks omitted) (quoting *Czekalski I*, 475 F.3d at 364–65). Summary judgment for the defendant may nonetheless be appropriate, however, if no reasonable trier of fact could find that the challenged reassignment affected the plaintiff's duties sufficiently to qualify as materially adverse. *See Forkkio*, 306 F.3d at 1131–32.

Application of these legal principles to Count I is discussed next.

### 2.    *The Plaintiff's Evidence of Age Discrimination*

In moving for summary judgment, the defendants contend that the plaintiff cannot establish "that age was a factor in his reassignment." Defs.' Mem. at 12–14. As support for his claim of age discrimination, the plaintiff alleges that his supervisor, Dr. Henry, asked him to "do [her] a favor," to "step aside" and "move up to the front office, [to] give up [his] branch chief

role for the younger staff that just went through training at American University." Pl.'s Dep. at 5, 19–20, ECF No. 74-4. In the face of Dr. Henry's denial that she made any such statement, the plaintiff concedes that he has no witnesses, *id.* at 39, ECF No. 73-7, no recording, *id.* at 39–40, nor any contemporaneous notes, *id.* at 40, to corroborate his allegation that this conversation ever occurred, but he does provide a declaration of a colleague who claims to have had a similar conversation with Dr. Henry. *See* Seed Decl.

With this allegedly direct evidence obviating any need of an inference or circumstantial evidence of discrimination, determining whether a reasonable jury could conclude that age was a factor in the plaintiff's reassignment should be straightforward, but the defendants have confused matters in at least two ways. First, the defendants discount the plaintiff's recollection of his conversation with Dr. Henry's as uncorroborated, unsubstantiated, self-serving, and not credible, Defs.' Mem. at 12–14; Defs.' Reply at 2–6, notwithstanding that, at this stage of the proceedings, all inferences are to be drawn in the plaintiff's favor and "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Reeves*, 530 U.S. at 150–51. Second, the defendants, in part because they discount the plaintiff's evidence, wholly fail to recognize that he has offered *direct*, rather than circumstantial, evidence that age was a factor in his reassignment. *See* Defs.' Mem. at 14–16. Defs.' Reply at 3–7. This error leads them to focus on the *McDonnell Douglas* framework for circumstantial evidence, which is simply irrelevant if direct, though disputed, evidence of discrimination has been presented.[15]

The defendants make much of the fact that the plaintiff's only evidence that age was a factor in his own reassignment is his "self-serving" recollection of a conversation he claims to

---

[15]     If the plaintiff presented only circumstantial evidence for an inference of discrimination, the defendants' focus on their "legitimate, nondiscriminatory reason[s]" for reassigning him would be relevant. *McDonnell*

have had with Dr. Henry, urging the Court to find this evidence "insufficient to create a genuine issue of material fact to overcome EPA's articulated reasons for the reassignment." Defs.' Mem. at 13 (citing *Fields v. Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) and *Sloan v. Urban Title Servs., Inc.*, 689 F. Supp. 2d 94, 122 n.16 (D.D.C. 2010)).[16] This is just part of the defendants' broadside attack on the plaintiff's credibility. *See id.* at 13–14 (arguing the plaintiff has not produced credible evidence, especially where "Dr. Henry explicitly and categorically denies" his account); Defs.' Reply at 3 ("Plaintiff has failed to offer any credible evidence to show that his reassignment was based on age."); *id.* at 4 ("[T]he only evidence that Plaintiff identifies to support his argument of age discrimination is his own uncorroborated testimony."); *id.* at 7 n.2 ("Plaintiff now claims that he never made a recommendation regarding [the reorganization], but his own emails say otherwise, and this record evidence significantly undermines his credibility."). The defendants' focus on credibility is entirely unhelpful since no credibility determinations should be made at the summary judgment stage. *Mayorga v. Merdon*, 928 F.3d 84, 93–94 (D.C. Cir. 2019) (classifying this type of argument as "a mere makeweight" because "[t]o the extent the testimony of a witness who is also a party may be impaired by party self-interest, it is ordinarily the role of the jury—not the court on summary judgment—to discount it

---

*Douglas*, 411 U.S. at 802. The defendants argue vigorously that the reorganization was meant to "improve OPPT's risk assessments by fostering better-integrated, more-coherent, and more-clearly articulated characterizations of human health and ecological risk," Defs.' Mem. at 15 (citing Reorganization Mem.), and that the plaintiff's "reassignment was warranted because of [his] unique experiences in technical and programmatic areas, as well as in several administrative processes that were essential to the division," *id.* (citing Henry Decl.¶¶ 10–11). "Because [Henry's] statements constitute direct evidence of discrimination," it is unnecessary to determine whether these "proffered, nondiscriminatory rationales . . . were non-pretextual." *Wilson v. Cox*, 753 F.3d at 248.

[16] The two cases relied upon by the defendants for the proposition that the plaintiff's self-serving statements are insufficient to withstand summary judgment are singularly unhelpful since one has been abrogated and the other is inapposite. Insofar as *Fields* stands for the proposition that "self-serving testimony does not create genuine issues of material fact," Defs.' Mem. at 13, the D.C. Circuit has made clear that the district court in *Fields* "erred and [that interpretation] should not be followed; we have said as much," *Scott v. Dist. Hosp. Partners L.P.*, 715 F. App'x 6, 7 (D.C. Cir. 2018) (per curiam) (unpublished) (citing *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016)). Meanwhile, *Sloan* dealt with a plaintiff's assertions that he merely *believed* certain events had occurred, not that he had *witnessed* those events as they occurred, 689 F. Supp. 2d at 122 & n.16, a far different scenario than the plaintiff in this case.

accordingly" (quoting *Johnson v. Perez*, 823 F.3d at 710)). Thus, despite the defendants goading to the contrary, this Court has no authority to take the question of the plaintiff's credibility as a witness away from a jury solely on the basis that his account is uncorroborated and self-serving.[17] *See United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in U.S. Currency*, 859 F.3d 1085, 1092 (D.C. Cir. 2017) ("This is the standard even when the court entertains grave doubts about a statement proffered by the party opposing summary judgment." (internal quotation marks and citation omitted)).

Moreover, the defendants, in their rush to challenge the credibility of the plaintiff's own account, fail to acknowledge that he *has* offered corroboration, in the form of Dr. Seed's declaration and deposition in her own anti-discrimination suit. *See* Defs.' Mem. at 13 ("Plaintiff . . . has no corroborating evidence such as internal documents, audio or video recordings, or any corroborating witnesses to give credence to his claim that management sought to reduce the ranks of older workers"); Defs.' Reply at 1 ("Plaintiff relies merely on his own self-serving statements and unsubstantiated speculation."); *id.* at 3 ("Plaintiff has failed to offer any credible evidence to show that his reassignment was based on age."); *id.* at 5 n.1 (only addressing Dr. Seed's declaration as to the remarks allegedly made to the plaintiff, ignoring the remarks allegedly made to Dr. Seed). Even if the defendants were correct that the plaintiff's uncorroborated, self-serving testimony fails to create a genuine issue of a material fact—and they are not—the testimony here *is* corroborated.

---

[17] A different conclusion would be possible if the plaintiff's account were "so undermined as to be incredible," *Robinson*, 818 F.3d at 10 (internal quotation marks and citation omitted), for example, if it were "supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined either by other credible evidence, physical impossibility or other persuasive evidence that the plaintiff has deliberately committed perjury," *Chenari v. George Washington Univ.*, 847 F.3d 740, 747 (D.C. Cir. 2017). The plaintiff's account of Dr. Henry's statements does not meet this standard.

Taking the plaintiff's account of Dr. Henry's statements at face value, this constitutes direct evidence of age discrimination, and therefore the attention the defendants give to the *McDonnell Douglas* burden-shifting framework is ill spent. Such direct evidence, taken as true, would allow a reasonable jury to conclude without making any further inferences that age was a factor in his reassignment. The plaintiff alleges his supervisor asked him to "step aside" and "move up to the front office, [to] give up [his] branch chief role for the younger staff that just went through training at American University." Pl.'s Dep. at 5, 19–20, ECF No. 74-4. Such comments are not "subject to multiple interpretations." *Breen v. Chao*, 253 F. Supp. 3d at 258 n.9. Even if Dr. Henry intended to focus not on the age of potential employees, but on their American University training, the plaintiff has alleged that his supervisor, when discussing his reassignment, explicitly cited age as one reason that she preferred to assign certain candidates for a position rather than the plaintiff. "The defendants are fully free to advance [an alternative] argument at trial; but at the summary judgment stage, an alternative interpretation of that kind cannot overcome the need to draw inferences in the non-moving party's favor." *Wilson v. Cox*, 753 F.3d at 248.

The age-related statements allegedly made by Dr. Henry are almost as direct as the offending comments in *Wilson v. Cox*— that older employees "didn't come here to work, [they] came here to retire." *Id.* at 248–49. Of course, unlike the comments in *Wilson v. Cox*, or those in *Steele v. Mattis*, 899 F.3d 943, 946 (D.C. Cir. 2018), on which the plaintiff heavily relies, *see* Pl.'s Opp'n at 3–5, 14, the decisionmaker here did not disparage older workers; she merely expressed favor for younger workers who had American University training. In *Steele*, the employer both praised younger employees as "a breath of fresh air," "eager to please," and "the kind of . . . people who are making [the office] marvelous," and denigrated older employees as

"stubborn" and "difficult to work with." *Steele*, 899 F.3d at 946 (internal quotation marks omitted). These comments were deemed to be "open hostility to older workers" that "should have been recognized for what [they were]—direct evidence of illegal discrimination." *Id.* at 951. Whether Dr. Henry's alleged statements are properly understood to praise younger employees or to denigrate older employees is not the point: in an ADEA action against the federal government, the plaintiff is only required to prove that age was "a factor" in the decision. *Id.* at 945 (quoting *Ford*, 629 F.3d at 207). The plaintiff has provided such direct evidence here.

This evidence would be sufficient to avoid the burden-shifting analysis of *McDonnell Douglas* and proceed to trial if the plaintiff had also produced evidence sufficient for a reasonable trier of fact to determine that he actually suffered an adverse employment action.[18] On this element, the plaintiff falters, as discussed next.

### 3. *The Challenged Employment Action*

The issue that proves fatal to the plaintiff's claim is whether he "suffered an adverse employment action." *Baloch*, 550 F.3d at 1196. In moving for summary judgment, the defendants contend that as a matter of law, the plaintiff's reassignment did not rise to this level. *See* Defs.' Mem. at 9–12. The Court agrees that, considering each of the potential bases for

---

[18]     The plaintiff submitted a declaration from Dr. Seed, who states that Dr. Henry expressed to Dr. Seed a preference for assigning younger employees the position of Branch Chief. *See* Seed Decl. ¶¶ 3–5, 7. Thus, even if Dr. Henry's alleged remark to the plaintiff fell short of constituting direct evidence of age discrimination, Dr. Henry's alleged remarks to both the plaintiff and to Dr. Seed would provide circumstantial evidence giving rise to an inference of discrimination. The defendants have a two-pronged challenge to Dr. Seed's declaration. First, the defendants highlight that Dr. Seed refers to a conversation the plaintiff had "in the lead-up to a RAD reorganization beginning in 2013," Defs.' Reply at 5 n.1 (quoting Seed Decl. ¶ 5), but argue that the conversation with Dr. Henry "could not have occurred in the beginning of 2013 because Dr. Henry did not participate in the reorganization process until mid-2013 and did not join RAD until November 3, 2013," *id.* This apparent incongruity in the timeline is simply not persuasive since (1) both the reorganization and the "lead-up" to it did begin in 2013; (2) the defendants admit that Dr. Henry began participating in the reorganization as early as mid-2013; and (3) even if Dr. Seed's declaration implies that the plaintiff had a conversation in the beginning of 2013 rather than near its end, no genuine dispute has surfaced about a conversation between the two occurring at some point in 2013. Second, the defendants claim that Dr. Seed's declaration "lacks any probative force because it is hearsay," *id.,* but Dr. Seed has "firsthand knowledge of the alleged age-related remarks" made to *her*. *See* Seed Decl. ¶¶ 3, 4, 7.

finding an adverse employment action, even "drawing all inferences in favor of the [plaintiff], a reasonable jury could not return a verdict in [his] favor." *Davis v. District of Columbia*, 925 F.3d 1240, 1248 (D.C. Cir. 2019).

The plaintiff's strongest argument for surviving summary judgment on the adverse action issue is that he "was stripped of all management [and] supervisory responsibilities" in his reassignment. Pl.'s Opp'n at 3. To be sure, the law of this Circuit provides ample support for the proposition that loss of one's supervisory role often amounts to adverse action for the purposes of employment discrimination statutes. *See*, *e.g.*, *see Czekalski I*, 475 F.3d at 364 (quoting *Stewart*, 352 F.3d at 427 ) ("[W]ithdrawing an employee's supervisory duties . . . constitutes an adverse employment action."); *Wilson v. Clayton*, 2019 WL 1879547, at *5. The problem the plaintiff faces with respect to this issue is not the inadequacy of his legal argument, but rather the inadequacy of his evidence to convince a reasonable trier of fact that he was indeed stripped of such responsibilities. The plaintiff's reassignment lasted, at most, four work days— and that may be an exaggeration. *See* Defs.' SMF ¶ 10; Notification of Personnel Action at 40; *Townsend I*, 236 F. Supp. 3d at 295; SAC ¶ 43. The plaintiff himself admits to some confusion as to whether he ceased being Branch Chief, or whether he ceased being responsible for Branch Chief duties. *See* Pl.'s Dep. at 53, ECF No. 73-7 ("Dr. Tala Henry had obviously not decided what I was going to do [or] when I was going to do it and did not come in and say, 'Mark, you are no longer a branch chief.'") The plaintiff alleges that his "staff were being picked up by other people periodically to do things," but he nevertheless concedes that he "was still being held accountable to get certain projects done." *Id.* at 57. Furthermore, the plaintiff avers that "up until they gave [him] the form that said [he] was a biologist" and removed him from the building,

*id.* at 52, he "was still a branch chief doing [his] work," *id.* at 36, and that he never "serve[d] as a senior advisor at the EPA at the RAD Immediate Office," *id.* at 37.

While it is true that Dr. Henry at one point characterized the position to which the plaintiff was eventually reassigned as "non-supervisory," August 2013 Email from Henry at 2, the plaintiff cannot be said to have suffered an adverse employment action if he never in fact served in that non-supervisory position. In short, if a jury believed the plaintiff's testimony in full, the only conclusion that reasonably could be drawn is that the plaintiff might have lost his supervisory duties *had he remained in his position*. *But see* Defs.' Reply at 3 ("[T]he reassignment would have afforded Plaintiff significant programmatic responsibilities if he had not been terminated for misconduct."). Such speculation as to what the plaintiff's employment conditions might have been falls outside "the outer bounds of the 'objectively tangible harm' [the ADEA] requires." *Wilson v. Clayton*, 2019 WL 1879547, at *5; *see also Forkkio*, 306 F.3d at 1131 ("[A]n employee suffers an adverse employment action if he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.").

The plaintiff further argues that he suffered an adverse action because following his reassignment, he was "assigned 'scanning' work well below grade level." Pl.'s Opp'n at 3. The evidentiary support for this statement from the plaintiff's deposition is that he was tasked with "creat[ing] a system," which the plaintiff then apparently had to populate with scanned records, Pl.'s Dep. at 18, ECF No. 74-4, "that were the record[s] of all work done pre-decisional on PMNs since the TSCA program started," *id.* at 52–53, ECF No. 73-7. Even years later, this system is still not operational. *Id.*; *id.* at 25–26, ECF No. 74-4 ("My new responsibilities as a

biologist were to scan documents into a system that had not yet been created, nor that had been funded and nor—and as of this date of today, the project has never been supported, funded or initiated . . .").  He worked on this project only a half hour before he was escorted from the building.  *Id.* at 26, ECF No. 74-4.  A jury that believed the plaintiff's testimony could easily understand that creation of a system from scratch to hold agency records relating to agency decisions may involve the scanning of documents but would also require some sophisticated understanding of agency processes and information technology systems, raising significant questions as to whether the plaintiff was correct that such work would ordinarily be assigned to library staff at the GS-11 to GS-13 level, *id.* at 28, or that this assignment amounted to "busy work," *id.* at 26.

The plaintiff plainly viewed this assignment, which he worked on by his own admission for only a half hour, as "below-grade-level," *id.* at 26, 28, but his own perception of this new responsibility for creation of a new system is not dispositive of whether this task amounts to an adverse employment action.  The assignment of *additional* responsibilities simply does not rise to the level of an adverse employment action.  *See Forkkio*, 306 F.3d at 1131 ("[Plaintiff's] substantive responsibilities were not reduced: he was given additional functions to perform."); *Lester*, 290 F. Supp. 2d at 29–30 ("Courts have recognized that increases in workload or changes in responsibility are not adverse employment actions, but rather constitute only the ordinary tribulations of the workplace, which employees should expect." (citations and internal quotation marks omitted)).

While the plaintiff may be able to convince a jury that scanning documents is, to a Branch Chief, "qualitatively inferior work requiring . . . less skill or knowledge," *Baloch*, 550 F.3d at 1197, he would also have to provide evidence that this work *replaced* rather than

*supplemented* his previous responsibilities. The plaintiff has offered no such evidence, and has in fact offered statements that directly contradict that proposition. *See* Pl.'s Dep. at 57, ECF No. 73-7 ("I lost no projects that were mine and actually picked up extra projects."), *id.* at 52 ("I was still managing brominated flame retardants, I was still managing other projects, I was still being asked by Tala Henry to attend management meetings discussing the new tracking system."). The plaintiff speculates that the reassignment meant that he "wasn't going to do [Branch Chief work] anymore"—that he "was going to be scanning paper documents . . ." *Id.* at 52–53. Yet with mere speculation that creation of the new system, with some scanning work, would have replaced the plaintiff's previous responsibilities, and without any further evidence, "a reasonable trier of fact could [not] find objectively tangible harm" in the assignment of the task of creating a new system that also involved scanning work. *See Forkkio*, 306 F.3d at 1131.[19]

In sum, the plaintiff's reassignment had no impact on his pay, hours, or benefits, and he has failed to produce evidence sufficient for a reasonable trier of fact to conclude that "the reassignment left the plaintiff with significantly diminished responsibilities," *Czekalski I*, 475 F.3d at 365, without speculating as to what his duties might have been had the reassignment gone fully into effect before he was fired for independent reasons. While the plaintiff has provided direct evidence which could lead a reasonable trier of fact to conclude "that age was *a* factor in

---

[19] The plaintiff primarily focuses on the alleged loss of supervisory duties and the assignment of scanning work as constituting adverse actions but also raises several other allegations that, for the sake of thoroughness, are addressed here. The plaintiff claims that his "private office and privacy with a door was [sic] removed," that he "was moved into an office shared with a GS-13, one of [his] previous staff," and that he "was moved out of an office with a clear story that had access to sunlight into an area where there was no sunlight." Pl.'s Dep. at 54–55, ECF No. 73-7. This office move caused him some embarrassment "because other managers would come down the hallway and say, 'What happened, Mark? You're the only person that I know that wants to be a branch chief. How did you get set aside? How did you get demoted?'" *Id.* at 37, 55. None of these allegations, however, give rise to a reasonable finding of adverse action since they only represent "dissatisfaction with a reassignment, public humiliation, or loss of reputation" *Holcomb*, 433 F.3d at 902, which are not sufficient to constitute an adverse job action.

the challenged personnel action," *Ford*, 629 F.3d at 206 (emphasis in original), discriminatory

intent is only one of "the two essential elements of [an age] discrimination claim," *Baloch*, 550

F.3d at 1196.  Accordingly, the defendants are entitled to summary judgment on Count I.

## B.     Count II: Pattern and Practice of Age Discrimination

In Count II, the plaintiff alleges that the EPA engaged in a pattern and practice of

discrimination against older employees in violation of the ADEA.  *See* SAC ¶¶ 59–75.  This

count was initially dismissed, *see Townsend I*, 236 F. Supp. 3d at 306, but was reinstated in light

of more specific allegations added in the Second Amended Complaint, *see Townsend II*, 282 F.

Supp. 3d at 127–28.  In allowing this claim to go forward, however, the plaintiff was cautioned

that "[t]he evidence remains thin inasmuch as it is far from clear, even accepting the plaintiff's

allegations as true, that discrimination has been the employer's regular or systemwide pattern or

practice, *i.e.*, that the discrimination was the company's standard operating procedure—the

regular rather than the unusual practice."  *Id.* at 128 (internal quotation marks omitted) (quoting

*Aliotta v. Bair*, 614 F.3d 556, 562 (D.C. Cir. 2010) (quoting *Teamsters*, 431 U.S. at 335)).

Nearly two years later, the evidence is so bare that the defendants are entitled to summary

judgment.

### 1.     *Legal Standard*

The Supreme Court laid out the framework for pattern or practice discrimination suits in

*Teamsters*, 431 U.S. at 336.  Under this framework, the plaintiff "[bears] the initial burden of

making out a prima facie case of discrimination."  *Id.* (citing *Albemarle Paper Co. v. Moody*, 422

U.S. 405, 425 (1975), then citing *McDonnell Douglas*, 411 U.S. at 802).  Specifically, a plaintiff

"alleg[ing] a systemwide pattern or practice" of unlawful discrimination must demonstrate that

such discrimination "was the [employer's] standard operating procedure[,] the regular[,] rather

than the unusual[,] practice," and accordingly, must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Id.* (footnote omitted); *see also Aliotta*, 614 F.3d at 562 (explaining that "[d]isparate treatment claims brought under the ADEA may involve 'an isolated incident of discrimination against a single individual, or . . . allegations of a 'pattern or practice' of discrimination affecting an entire class of individuals.'" (quoting *Palmer v. Shultz,* 815 F.2d 84, 90 (D.C. Cir. 1987)); *Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1370 (D.C. Cir. 2008) (applying the *Teamsters* framework to the ADEA). "Once a prima facie case is established" under the *Teamsters* framework, "the burden shifts to the employer to rebut the inference of discrimination by showing the employees' proof is either inaccurate or insignificant. . . . [f]ailure to rebut the inference moves a pattern and practice case to the remedial stage where each class member must show individual harm." *Aliotta*, 614 F.3d at 563 (citing *Teamsters*, 431 U.S. at 360–62).

"In a disparate treatment claim, plaintiffs seek to prove an employer intentionally treated some people less favorably than others because of their age." *Id.* at 561 (citing *Reeves*, 530 U.S. at 141). "[I]n a disparate impact claim, plaintiffs challenge employment practices that are 'facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity,'" and accordingly, "[p]roof of discriminatory motive . . . is not required." *Id.* at 561–62 (ellipses in original) (internal quotation marks omitted) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993)). "Plaintiffs alleging age discrimination in violation of the ADEA may seek recovery under both disparate treatment and disparate impact theories of recovery." *Id.* at 561 (citing *Smith v. City of Jackson*, 544 U.S. 228, 236–40 (2005)).[20] "Doctrinally speaking, . . . the central distinction between a

---

[20]  Whether the ADEA, by contrast to Title VII and other employment discrimination statutes, allows disparate impact claims against the federal government is debated. *See, e.g.*, *Anderson v. Duncan*, No. 06-cv-1565 (RMC),

disparate impact case and a 'pattern or practice' disparate treatment case is that only the latter requires proof of discriminatory intent. . . . But if intent can be inferred from observed statistical disparities, the more practical distinction is that disparate impact plaintiffs identify particular employment practices that are allegedly responsible for those disparities, while 'pattern or practice' [disparate treatment] plaintiffs do not." *Davis v. District of Columbia*, 949 F. Supp. 2d 1, 8–9 (D.D.C. 2013) (citations omitted).

## 2. *The Plaintiff's Evidence of Pattern or Practice Disparate Treatment*

The pattern or practice claim brought by the plaintiff in Count II is of the disparate treatment variety. *See Townsend I*, 236 F. Supp. 3d at 306; *Townsend II*, 282 F. Supp. 3d at 127. Specifically, the plaintiff alleges that "[s]enior EPA officials, beginning in 2013–2013 [sic], targeted older, more experienced personnel (including Plaintiff, Dr. Jennifer Seed, Dr. Kay Austin and Dr. Phillip Sayre) and subjected them to disparate treatment, continuing hostile work environments, intolerable working conditions, and prohibited personnel practices considered constructive adverse actions." SAC ¶ 60; *see also id.* ¶ 63. Assuming the plaintiff, as an individual, may maintain a pattern or practice claim, in order to survive summary judgment on the *prima facie* case, he must provide evidence sufficient for a jury to conclude that the EPA "intentionally treated some people less favorably than others because of their age," *Aliotta*, 614 F.3d at 561 (citing *Reeves*, 530 U.S. at 141), and that this discriminatory treatment was the agency's "standard operating procedure," *Teamsters*, 431 U.S. at 336. Despite having nearly two

---

2013 WL 12328768, at *2 (D.D.C. Nov. 15, 2013) (Collyer, J.) (noting a "substantial ground for difference of opinion as to . . . whether disparate impact claims against the federal government are cognizable under the ADEA") (collecting cases); *American Federation of Government Employees TSA Local 1 v. Hawley*, 481 F. Supp. 2d 72, 91–92 (D.D.C. 2006) (Kollar-Kotelly, J.) (holding that such claims against the federal government are "not cognizable under the ADEA"); *Silver v. Leavitt*, No. Civ.A. 05-0968 JDB, 2006 WL 626928, at *13 (D.D.C. Mar. 13, 2006) (Bates, J.) (same); *Evans v. Atwood*, 38 F. Supp. 2d 25, 28–30 (D.D.C. 1999) (Urbina, J.) (same); *but see Breen v. Peters*, 474 F. Supp. 2d 1, 6–7 (D.D.C. 2007) (Roberts, J.) (concluding that "the plain language of [the ADEA] does not support the distinction between disparate treatment and disparate impact"). Regardless, the instant litigation involves only a disparate treatment theory.

34

years to do so, the plaintiff has provided almost no further evidence, and has failed to make a *prima facie* case under *Teamsters*, *id.*

As noted, Dr. Seed is currently engaged in her own litigation against the EPA, *see Seed v. EPA*, No. 16-cv-748 (TSC), and has alleged in that litigation and in documents submitted in this instant litigation that Dr. Henry discouraged her from seeking a Branch Chief position in the reorganization due to her age, *see* Seed Decl.¶ 2–4, 7; Seed Dep. at 2–3.  Of the other employees the plaintiff lists as having been discriminated against on the basis of age, assuming the reorganization took effect as proposed, each retained the exact same pay grade and, in some instances, title, while simply moving branches following the reorganization.  *See* Reorganization Mem., Current and Proposed Staffing Plans.  Specifically, of the two "Austins" listed, neither of whom has the first name "Kay," Helen K. Austin moved from Associate Division Director of the Economics Exposure & Technology Division, GS-1301-15 to Senior Advisor (Env. Scientist), GS-1301-15 in the Immediate Office of the RAD, *id.* at 12, 22, while Sharon Austin remained a Chemical Engineer, GS-0893-13, moving from the Chemical Engineering Branch of the Economics Exposure & Technology Division to Assessment Branch I of the RAD, *id.* at 13, 23, and Phillip Sayre remained a Biologist, GS-0401-15, moving from the New Chemicals Screening & Assessment Branch of the RAD to Assessment Branch IV of the RAD, *id.* at 17, 25.

Not only has the plaintiff failed to offer any evidence that Austin or Sayre suffered adverse treatment, age-related or otherwise—he has failed even to provide an explanation as to why he believes they did.  Instead, he merely states that he has "[n]o doubt at all" that the EPA discriminated against Austin and Sayre on the basis of their age, Pl.'s Dep. at 29, ECF No. 74-4, yet he also acknowledges that this is his "opinion," that he is not sure of their age, and concedes "I don't know exactly what happened and why.  All I can tell you is based on perceptions [and]

observations," *id.* at 42, 45–46, ECF No. 73-7.  Neither Austin nor Sayre has provided a declaration, deposition, or any other form of evidence to support the plaintiff's opinion.  The plaintiff only mentions Sayre and Austin once in his opposition to the defendants' motion, and then only to assert, without explanation, that the government's questions in his own deposition somehow create a genuine issue of material fact.  *See* Pl.'s Opp'n at 10–11 ¶ 23.  At no point in the nearly two years since the pattern or practice claim was permitted to proceed has the plaintiff elaborated as to how specifically any EPA employee other than himself or Dr. Seed might have suffered an adverse employment action.  As discussed *supra*, Section III.A.2, a discrimination plaintiff's own, self-serving testimony can create a genuine issue of material fact when the plaintiff testifies that she or he witnessed facts which would satisfy the elements of the claim. *See Mayorga*, 928 F.3d at 93–94.  When the plaintiff instead offers mere speculation and conclusory statements akin to office gossip or grumbling, the plaintiff's testimony does nothing to help the claim survive summary judgment.  *See Sloan*, 689 F. Supp. 2d at 122 (once discovery is closed, the plaintiff "can no longer rely on unsupported allegations").  Here, the plaintiff offers neither direct nor circumstantial evidence that would even begin to establish a *prima facie* case of a pattern or practice of discrimination with regards to anyone other than himself or Dr. Seed. Hence, for purposes of evaluating the defendants' motion to dismiss Count II, the only relevant evidence supportive of this pattern and practice claim relates to the plaintiff and Dr. Seed's allegations that they suffered disparate treatment because of their age.

The plaintiff's evidence of age discrimination against himself is discussed at length, *supra*, Section III.A.2, with his most powerful evidence the statements allegedly made by Dr. Henry to him and to Dr. Seed.  Even if the plaintiff could convince a jury that both he and Dr. Seed were actually subjected to the alleged statements by Dr. Henry about promoting younger

employees and that they were thereby "intentionally treated . . . less favorably than others because of their age," *Aliotta*, 614 F.3d at 561 (citing *Reeves*, 530 U.S. at 141), he could only establish "the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts," *Teamsters*, 431 U.S. at 336, not that age discrimination was the EPA's "standard operating procedure," *id.* Two instances of alleged discrimination do not a pattern or practice make. Thus, the plaintiff has failed to establish a *prima facie* case under the *Teamsters* framework. If the plaintiff were instead attempting to proceed on a disparate impact theory, his claim would fare no better, as he has offered no statistical evidence whatsoever to support his allegations.

Even if the plaintiff could establish a *prima facie* case, and even if the defendants subsequently failed to rebut that case, the plaintiff lastly failed to show how he could recover after advancing to "the remedial stage where each class member must show individual harm," *Aliotta*, 614 F.3d at 563 (citing *Teamsters*, 431 U.S. at 361–62), because he cannot demonstrate that he himself suffered an adverse employment action, as discussed *supra* Section III.A.3. To the extent the plaintiff has pursued his pattern and practice disparate treatment claim in Count II to bolster his evidence of discriminatory intent in Count I, that strategy is flawed. The plaintiff's evidentiary obstacle is not evidence of discriminatory intent, but evidence of an adverse employment action. Without any evidence that the plaintiff suffered material harm as a result of the plaintiff's reassignment, he cannot invoke *Teamsters* to transform evidence of discrimination against other employees into a cognizable claim for himself.

\*       \*       \*

In sum, the defendants are entitled to summary judgment on both the age discrimination claim in Count I and the pattern or practice claim in Count II, because no genuine issue of material fact remains by which a reasonable trier of fact could find for the plaintiff.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is GRANTED as to both Counts.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: August 27, 2019

_____

BERYL A. HOWELL
Chief Judge